Susan Lucille **WRIGHT**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 14–04–00244–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 17, 2005.

Brian W. Wice, Stanley G. Schneider, Houston, for appellant.

Dan McCrory, Houston, for state.

Panel consists of Chief Justice HEDGES and Justices FOWLER and FROST.

## OPINION

WANDA McKEE FOWLER, Justice.

Susan Lucille Wright was accused of murdering her husband, Jeff Wright, whose body was found with almost 200 stab wounds. Appellant admitted that she inflicted all the stab wounds, but claimed she began stabbing her husband in self-defense. The State argued that she planned the murder and, to underscore that point, two prosecutors staged an in-court demonstration on the couple's bed to show how appellant would have accomplished the murder.

A jury found appellant guilty of first-degree murder in the death of her husband, and assessed her punishment at twenty-five years' confinement in the Texas Department of Criminal Justice, Institutional Division. Appellant's primary issue on appeal is that the trial court erred in permitting the prosecution to stage an in-court demonstration of its theory of how Jeff Wright died, because it caused the jurors to confuse high drama with reality.

Appellant claimed her husband raped her and then threatened to kill her with a knife. Hearing the threat, appellant struggled with Jeff Wright for the knife and, during the struggle, stabbed him. Thus, appellant claims she began acting in self-defense. The State, on the other hand, claimed appellant seduced her husband, tied his arms and legs to the bed as part of the seduction, and then murdered

him. The in-court demonstration showed where and with what appellant tied her husband and the location of the knife wounds.

Appellant's argument regarding the demonstration seems to be that, if the State has no eyewitnesses to the event, Rule 602 of the Texas Rules of Evidence prevents the State from staging the demonstration because its witness would have no personal knowledge of the staged events. We hold that the demonstration was based on two types of valid testimony: (1) testimony about which the witness did have personal knowledge; and (2) lay opinion testimony presenting reasonable inferences from the evidence of which the State's witness had personal knowledge. *See* TEX. R. EVID. 602, 701.

This valid testimony revealed a theory of the crime deduced from the crime scene itself and the many clues available at the scene—including the deceased's body, its many wounds, the bed, and the ligatures, or bindings, on the arms and ankle. Because the demonstration was based on evidence and accurately portrayed that evidence, the trial court did not abuse its discretion in allowing it. In addition, we conclude that the demonstration was not unfairly prejudicial to appellant. We also overrule appellant's other issues concerning alleged error (1) in the trial court's refusal to hold a hearing on appellant's motion for new trial, and (2) in the prosecutor's arguments to the jury. As a result of these rulings, we affirm the trial court's judgment.

**Factual Background**

Appellant was married to Jeff Wright. On Saturday, January 18, 2003, officers from the Harris County Precinct 4 Constable's Office investigated a report of a dead body in the yard of the Wright home. In the backyard, they discovered Jeff Wright's partially-buried body in a shallow hole next to a patio. The officers also found a mattress, box springs, comforter and headboard in the backyard. The mattress was soaked with blood. Inside the home, one wall of the master bedroom had been freshly painted and a piece of the carpet had been cut out; painting supplies, a box cutter, and scissors were found in the room. Blood spatters were seen on the curtains and other items in the bedroom. A receipt for two gallons of bleach, bleach-stained size 6 jeans, and a towel also were found.

The medical examiner concluded Jeff Wright died of multiple sharp-force injuries. He had been stabbed at least 193 times. Among these injuries, Jeff suffered 41 stab wounds to his face, 23 to his neck, 46 to his chest, 22 to his abdomen, 7 to his pubic region, including a superficial cut on his penis, 19 to his legs, 23 to his arms and hand, and one to his back. The tip of a knife was broken off in the top of his skull. Jeff Wright's body was found nude, but he had what were described as "ligatures" on his arms and one leg; specifically, tied around each wrist was a necktie, and tied around the right ankle was what appeared to be a part of a bathrobe sash. Candle wax was found on Jeff Wright's thigh and scrotum. It was later determined that Jeff Wright had been killed on January 13, 2003, five days before his body was found. Appellant was charged with his murder and, in early 2004, her trial began.

**Opening Statements**

In its opening statement at trial, the State told the jury that appellant killed her husband rather than seek a divorce, and that she sought to gain from a recently-acquired $200,000 insurance policy on Jeff Wright's life. According to the State, on the night Jeff was killed, appellant undertook an elaborate plan to seduce him so that, in anticipation of lovemaking, he would allow her to tie him to their bed.

Once Jeff was tied up and defenseless, appellant emerged with a knife and, with unfathomable anger, brutally stabbed him over and over again. Then, in the week that followed, appellant buried Jeff's body in the backyard, worked to cover up the evidence of her crime, and began a campaign of "lies and fabrications," telling Jeff's family and friends that Jeff had hit their son, abused her, and left home. As part of her plan, appellant also reported physical abuse to her doctor and filed criminal charges against Jeff, resulting in a warrant being issued for his arrest. It was only after the family dog dug up Jeff's body, the State concluded, that appellant's plan fell apart.

In sharp contrast, the defense's opening statement countered that appellant acted in self-defense. Jeff Wright had emotionally and physically abused appellant throughout their marriage, and the reason she did not leave him was that she was afraid he would kill her. On the night of his death, Jeff had come home under the influence of cocaine and hit their son in the face. When appellant told him he needed help for his rage issues, he became violent. He threw appellant on their bed, forcibly raped her, and threatened to kill her with a knife. Appellant struggled with him for the knife, got it away from him and stabbed him with it several times. At that point, appellant suffered a break from reality. She tied one of Jeff's hands to the bed, and continued stabbing in a panic that he would come back to life. Over the following week, in her delusional state, appellant continued to believe Jeff was still alive. The number of stab wounds found on Jeff's body, the defense concluded, evidenced her fear, not a premeditated, cold-blooded killing.

### The In–Court Demonstration

After calling several witnesses to explain how Jeff's body was located and what the police officers found at the Wright home, lead prosecutor Kelly Siegler sought to bring in the Wrights' blood-stained bed and set it up in the courtroom to demonstrate the State's theory of the case for the jury. Defense counsel, Neal Davis, objected to the demonstration as not based on personal knowledge, speculative, and too highly prejudicial. The trial court ruled that it would allow the State to "produce whatever reenactment they wish, as long as the proper predicate has previously been laid to show there is some basis in fact for the demonstration as you wish to portray it."

Ms. Siegler called to the witness stand Detective Mark Reynolds of the Harris County Sheriff's Department, Homicide Division. As the lead detective assigned to the case, Detective Reynolds had witnessed Jeff's body being unearthed, and later was present for the autopsy. Ms. Siegler asked Detective Reynolds a series of questions concerning the investigation, including these questions about the condition of Jeff Wright's body:

> The State: (Ms. Siegler) The large majority of the wounds that you saw on Jeffrey Wright's body were on the front or on the back?
>
> Witness: (Detective Reynolds) On the front.
>
> The State: Consistent with him being tied up which way, sir?
>
> Witness: Faceup.
>
> Defense: (Mr. Davis) Objection, Your Honor. That's speculation about being tied up. This witness has no personal knowledge to be able to testify about that.
>
> The Court: That's overruled.

After some additional questioning, the State prepared to present the demonstration. Defense counsel renewed his objec-

tions, which the trial court overruled.[1] The bed frame, mattress, and box springs from the Wright home were then admitted into evidence without objection for the State's proposed demonstration.

What followed is summarized from the trial transcript. Ms. Siegler began by having Detective Reynolds confirm that she and appellant were approximately the same weight and were both about five feet, three to five inches in height. Ms. Siegler next established that a prosecutor from her office, Paul Doyle, was approximately the same height and weight as Jeff Wright, based on Detective Reynolds' testimony that Jeff was six feet, two inches in height, and weighed 220 pounds. Ms. Siegler then presented two neckties and two bathrobe sashes that Detective Reynolds confirmed were similar to those he saw used as ligatures on Jeff Wright's body. Before the demonstration commenced, defense counsel took Detective Reynolds on voir dire. Reynolds admitted that he was not present on the night of the alleged incident, and the only person who was in the bedroom that night besides the deceased was appellant. Reynolds also did not know exactly where on the bed Jeff Wright was tied.

The State then began the demonstration. Ms. Siegler instructed Mr. Doyle to lie down with his back on the bed, his head at the headboard, and his feet at the footboard. Next, she instructed Detective Reynolds to step down from the witness stand and tie one of the neckties to Mr. Doyle's left wrist. Ms. Siegler asked Detective Reynolds this question:

> The State: (Ms. Siegler) Okay. And if [the necktie] were tied to a bed, it would be tied similar to what, in your opinion?

Witness: (Detective Reynolds) Speculate, I guess. That a—

Defense counsel objected that the testimony, by Reynolds' own admission, was based on speculation. In response, the trial court stated, "Well, the Jury should understand that as far as the exact location as to where and if this ligature was tied to the bed, that's not being presented as the exact spot; is that correct?" Ms. Siegler acknowledged that was correct, and proceeded to have Detective Reynolds tie both of Mr. Doyle's wrists to the bed.

Ms. Siegler next sought to have Mr. Doyle's ankles tied to the bed with the two bathrobe sashes. Over the defense's objections, one ankle was tied, but when Ms. Siegler instructed Detective Reynolds to tie the other ankle, defense counsel objected that only one sash was recovered and argued that "this is just theatrics." In response, the trial court commented that there was no evidence of a second sash. Ms. Siegler then instructed Detective Reynolds to remove the sash from one ankle.

Continuing, Ms. Siegler got on top of Mr. Doyle on the bed, holding a knife, and—while questioning Detective Reynolds—demonstrated the State's theory that, while Jeff Wright was tied to the bed, appellant straddled him and stabbed him repeatedly:

> The State: (Ms. Siegler) All right.
> So, if—if the defendant were to get up on top of Jeffery [sic] Wright, something like this, and straddle him, and she's right-handed—and how do you think she held the knife?
> Put it in my hand.
> Defense: (Mr. Davis) This is just total speculation.

---

1. Defense counsel renewed his earlier objections, and further argued that the demonstration was "based on some speculative theory," was sponsored by a witness lacking personal knowledge, and was "overly theatrical and overly prejudicial to the Jury."

\* \* \*

The Court: Excuse me. If you'd go into a little more questions with the witness as to how he comes to the conclusion as to how the knife was held.

The State: Yes, sir.

Based on the injuries you saw and the direction of the cuts, tell the Jury why you believe ... the knife was held that way in my hand?

Witness: (Detective Reynolds) The locations or the injuries themselves are slicing and they're, 'em, top to bottom lengthwise. The length is greater than the width, to tell me that the blade was parallel with the body.

The State: And otherwise—in other words, vertical instead of horizontal?

Witness: I guess a good way to say it, vertical.

The State: That would be consistent with the knife going in this way, vertical, not this way, horizontal?

Witness: Correct.

The State: Is it a more natural fit in your hand to do it this way, as opposed to this way?

Witness: Yes.

The State: Okay. So if I'm on top of Paul, and I'm holding the knife this way in my right hand and I attack the head area first, which side of his face are most of the injuries going to be on?

Witness: On the left side.

\* \* \*

The State: Okay. And most of the injuries were where?

Witness: Concentrated to the left side of the head.

Ms. Siegler, still "straddling" Mr. Doyle on the bed, then moved from the head to the penis:

The State: (Ms. Siegler) Do you recall the photographs of the injuries in the area of his penis?

Witness: (Detective Reynolds) Yes.

The State: Okay. If I wanted to do stab areas, stab movements to his penis, did you see anything consistent with a stab to the penis?

Witness: Not to the penis itself, no.

The State: Because you saw what?

Witness: It was nicked. It was a superficial cut instead of a slicing.

The State: Superficial slicing, like this?

Witness: Yes.

Turning to the injuries on the legs, Detective Reynolds testified that he did not believe it was possible that the attacker could make those wounds while straddling the body. Instead, he testified that it would be more consistent with the attacker being on the side of the body. Apparently dismounting Mr. Doyle and standing next to him as she continued the demonstration, Ms. Siegler asked, "Like I am right now?" Detective Reynolds answered, "Yes." Ms. Siegler then turned her attention to the chest area, where most of the wounds on Jeff Wright's body were concentrated, and made stabbing motions toward Mr. Doyle's chest with the knife.[2]

---

**2.** The transcript is less than clear about the direction of the stabs, but it is later clarified in the following exchange:

The State: (Ms. Siegler) Neal [Davis, defense counsel] just wanted me to clarify on the record that when I was making the stabbing motion at Paul's chest, the knife was pointed in a direction where the wounds would have been horizontal to the floor. Is that right?

Defense: (Mr. Davis) Well, that you had the knife, you were holding the knife in your hand as someone would normally hold a knife. Except it was palm here, palm was facing downwards, and she was thrusting downwards to show the wounds were in the chest area.

Next, at defense counsel's request, Ms. Siegler and Mr. Doyle demonstrated Mr. Doyle's limited ability to move his hands and feet as Ms. Siegler sat on top of him holding the knife.[3] Then, in order to avoid having to re-tie Mr. Doyle to the bed, defense counsel was permitted to cross-examine Detective Reynolds concerning the demonstration. Counsel asked Reynolds about a stab wound on Jeff Wright's back near the shoulder and some wounds on the back of his leg. Reynolds refused to agree with counsel that the stab wound to the shoulder area could not have been made while Wright was tied up, but conceded that the injuries on the back of Wright's leg were stab wounds.

Finally, Ms. Siegler sought to portray the "hypothetical facts" of appellant's self-defense claim as stated in defense counsel's opening statement in an attempt to discredit her claim. After the trial court sustained several objections to Ms. Siegler's questions to Detective Reynolds, Ms. Siegler concluded her demonstration and the court recessed for lunch while the bed was disassembled.

**Appellant's Testimony**

Appellant testified that on the evening of January 13, 2003, Jeff Wright came home from a boxing lesson with red, glassy eyes and was extremely agitated. After hitting their son in the face when he refused to box, Jeff took a shower. When he came into their bedroom wearing a towel, appellant told him that unless he got help with his drug abuse and anger, she "couldn't take anymore." Jeff became angry, and threw appellant down, kicked her, and sexually assaulted her. Appellant closed her eyes during the sexual assault, "like [she] always did" when he forced her to have sex.

When appellant felt Jeff get back on top of her, she heard him say, "Die, bitch," and when she opened her eyes, she saw a knife in his right hand. She grabbed the knife, and as it came down, it hit her left knee, drawing blood. Her leg jerked up and hit Jeff in the groin. Because she "didn't want to die," appellant found the strength to get the knife and push him off her. She stabbed Jeff in the neck, and as he fought with her for the knife, she stabbed him again, this time deep in the chest. Terrified that he would get the knife back and kill her, she could not stop stabbing him. Appellant stopped when the couple's young son knocked on the bedroom door. She tied Jeff's right arm to the bed to keep him from getting up while she put her son to bed. Still terrified that Jeff was alive and was going to kill her, appellant returned to the bedroom and continued to stab him repeatedly. When she finally stopped, appellant tried to get Jeff's body out of the house. But, when she tried to drag him, his head and shoulder hit the nightstand, causing a candle to fall off the nightstand onto him. Appellant then tied him to a dolly by the ankles and left arm and pushed the dolly out to the patio.

---

The Court: I think you say it—the way I observed it was the sharp part of the blade was facing toward his, say, feet and the dull part of the blade facing toward the head.
Defense: That's more eloquent. Thank you. I wanted to make sure it was on the record. Thank you, Judge.

3. Ms. Siegler instructed Mr. Doyle as follows:
The State: (Ms. Siegler) First of all, Paul, move your hand up—your left hand up as hard and as high as you can.
(complied)

The State: That's as high as you can go? Okay. Move this foot up as high and hard as you can.
(complied)
The State: Okay. And if I'm sitting on top of you and I'm holding the knife, move your hands up like you're trying to get me.
(complied)
The State: That's all you can move? Is that good, Neal?
Defense: (Mr. Davis) That's fine.

## I. Issues on Appeal

On appeal, appellant raises seven issues, contending the trial court erred by (1) permitting the in-court demonstration in violation of Texas Rule of Evidence 602, (2) permitting the in-court demonstration in violation of Texas Rule of Evidence 403, (3) denying appellant a hearing on her motion for new trial,[4] (4) overruling appellant's objection to the State's reference to punishment during final argument in the guilt-innocence stage of the trial, (5) overruling appellant's objection to the State's final argument in the punishment phase when the prosecutor urged jurors to pound the jury room wall with their fists during deliberations, (6) overruling appellant's objection to the State's final argument in the punishment phase when the prosecutor told the jury that Jeff Wright's parents "would stand up right now and let God take them if it would bring Jeffrey back," and (7) overruling appellant's objection to the State's final argument in the punishment phase when the prosecutor urged the jury to impose a lengthy sentence so that appellant's two children could be given "stability" and not "traumatic dealings with their murdering mother." We address each issue below.

### A. The Demonstration: Issues One and Two and the State's Claim that We Cannot Consider the DVD

In her first two issues, appellant contends the State's in-court demonstration

violates Texas Rules of Evidence 602 and 403. As an initial matter, however, the State argues that appellant cannot prevail on these issues because the appellate record is inadequately developed. Specifically, the State contends that, to determine whether the demonstration accurately portrayed the murder or how prejudicial it was, it is necessary to actually view the demonstration, but the appellate record contains no recorded images of it.

### 1. The Court TV DVD of the Demonstration

The State acknowledges that appellant attached a DVD of Court TV's television coverage of the demonstration as an exhibit to her motion for a hearing and new trial, and we note that, in their appellate briefs, both parties refer to and (in varying degrees) rely upon this exhibit. However, the State maintains the exhibit was never introduced as evidence and was never subjected to adversarial examination to ensure its authenticity, and so cannot be considered on appeal.

▓▓▓ Three problems in this record complicate our ability to consider the DVD. First, the State cites the general proposition, contained in *Martins v. State*, that affidavits attached to a motion for new trial are merely pleadings and are not in themselves evidence. *See* 52 S.W.3d 459, 468 (Tex.App.-Corpus Christi 2001, no pet.).[5] Appellant contends *Martins* is dis-

---

4. Appellant requests that this court remand the cause for an out-of-time hearing on her motion for new trial as alternative relief in the event we do not reverse and remand for a new trial or punishment hearing.

5. The State also cites *Atchison v. Weingarten Realty Management Co.*, 916 S.W.2d 74, 76B77 (Tex.App.-Houston [1st Dist.] 1996, no writ), but we do not find that case instructive. In *Atchison*, the appellant challenged the trial

court's grant of summary judgment to the appellee, but the motion for summary judgment was not included in the record. A document purporting to be the motion for summary judgment was physically present in the record as an attachment to another document filed with the court clerk; however, because the court of appeals could not determine if this was the summary judgment motion actually filed, it concluded that the motion for

tinguishable because the trial court denied her motion without a hearing, thus depriving her of any opportunity to offer the DVD into evidence.[6] However, appellant does not direct us to any authority to support her contention that the DVD is evidence we may consider and we are aware of none.

Second, appellant did not declare to the trial court that she wanted the DVD to be part of the evidence. She never requested that the trial court admit it into evidence. She also never authenticated the DVD.

Third, the rules of evidence and of appellate procedure give us no guidance on whether and to what degree we may consider the DVD of the demonstration in these circumstances. It is a highly unusual exhibit for us to consider. Although it is a recording of the trial, unlike the official record, it was not prepared by a neutral court employee under the court's control. Instead, it is the product of a third party completely independent of the court. Without some guidance from the procedural rules of this state, and with the State's objection to its use, we are unwilling to rely on it when we have an acceptable alternative, and when we might jeopardize the validity of our appellate review by considering it.

The demonstration is captured in detail in over twenty pages of explicit trial testimony. In reading this testimony it is clear that Ms. Siegler, using a male prosecutor to represent Jeff Wright, positioned the prosecutor on the Wrights' bed, had a witness tie his arms to the bed posts with neckties and tie one leg to the bed with a bathrobe sash. Ms. Siegler then proceeded to sit astride him, holding the knife and demonstrating the types and angles of stabbing motions as instructed by Detective Reynolds. From these descriptions we can appreciate the dramatic nature of the demonstration. For years, appellate courts have decided the admissibility of in-court demonstrations without the benefit of videos. This particular demonstration is not so unique that we cannot adequately assess it without the video. We can tell where the two prosecutors were positioned—the male face-up on the bed, Ms. Siegler atop him. We know the Wrights' bed was used and that the blood stains were still visible. These, and the other details we can glean from the record, are sufficient to paint an image of what happened in the courtroom.[7] Having resolved this introductory issue, we now turn to the substance of appellant's complaints concerning the demonstration.

### 2. The In–Court Demonstration Did Not Violate Rule 602.

Throughout her first and second issues, appellant contends that the State's in-court demonstration of its theory of the case confused "high drama" with reality and thereby deprived appellant of her right to a fair trial. In appellant's first issue, she

summary judgment was not properly made a part of the appellate record and overruled appellant's points of error directed to the substance of the summary judgment ruling. *Id.* at 77. In contrast, no dispute exists here whether the DVD is actually the one attached to appellant's motion for a hearing and new trial.

**6.** Appellant also contends the State has waived its complaint because it did not object to appellant's motion to supplement the rec-

ord with the DVD or to this court's order granting the motion. To preserve error, the State needed to object when appellant asked this court to look at and consider the DVD; appellant first requested this in her appellate brief, not in the motion to supplement.

**7.** In fact, neither party contends, and we are aware of no authority so holding, that an in-court demonstration is reviewable on appeal only if captured on video.

contends that the court should not have allowed the demonstration because

- the State's witness testifying in support of the demonstration had no personal knowledge of the events about which he testified, and
- the State failed to show that the demonstration was substantially similar to the events it sought to portray.

Appellant apparently claims that both of these problems violated Rule 602 of the Texas Rules of Evidence. We disagree. As we explain below, Rule 602 does not bar the demonstration. Detective Reynolds had personal knowledge of a great many of the details about which he testified, and the remaining details he could reasonably deduce from those details he personally knew. In addition, Rule 602 is not the primary guidepost courts use to determine if a demonstration was appropriately admitted. Rather, case law sets out the requirements for the admission of demonstrations. That case law requires that the demonstration be substantially similar to the event it depicts. We turn first to Rule 602 and explain our holding there.

a. *The witness had personal knowledge of many things about which he testified.*

■ Rule 602 provides that a witness may not testify to a matter unless evidence is introduced showing that the witness has personal knowledge of the matter. TEX. R. EVID. 602.[8] Appellant contends that Detective Reynolds lacked personal knowledge of the circumstances surrounding Jeff Wright's death and so his testimony

could not support the State's in-court demonstration of its theory of the case.

However, we know Detective Reynolds had personal knowledge of a number of key facts because he was present at the crime scene, viewing both the body and the scene itself. For example, Detective Reynolds knew Jeff Wright was tied to some object because he saw the ligatures on Jeff's body (and appellant admitted tying Jeff to the bed at one point). He knew Jeff Wright was stabbed and that the wounds were inflicted on the couple's bed because he saw the bloody mattress and remnants of blood stains on the bedroom walls by the bed. He was able to study the wounds themselves, noting the direction of the stabs and the location of the wounds. He knew the relative sizes of Susan and Jeff Wright, surmising that Susan could not overcome her husband without some plan. Finally, he observed appellant's erratic behavior after the crime. All of these facts Detective Reynolds knew from personal knowledge and experience, and his testimony about them did not violate Rule 602.

b. *The witness could make reasonable inferences from the facts he knew.*

■ Those parts of the demonstration for which Detective Reynolds lacked personal knowledge were admissible as lay opinion because they were reasonable inferences from those facts he did know by personal knowledge. TEX. R. EVID. 701. Under Rule 701, a witness, even a lay witness, may make reasonable inferences from the evidence.[9] Detective Reynolds, as

---

8. Rule 602 provides in relevant part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness." TEX. R. EVID. 602.

9. Rule 701 provides as follows: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony

a lay witness, was entitled reasonably to infer how the crime occurred based on those facts he knew.[10] *See Osbourn v. State*, 92 S.W.3d 531, 535 (Tex.Crim.App. 2002) (stating that a witness's testimony can include opinions, beliefs, or inferences as long as they are drawn from his or her own experiences or observations); *Ventroy v. State*, 917 S.W.2d 419, 422 (Tex.App.-San Antonio 1996, pet. ref'd) (holding officer's testimony about point of impact, automobile's direction of travel, and other opinions about crime scene was admissible as both lay opinion and expert testimony in trial for attempted murder of victim struck by automobile when based on personal knowledge and experience); *Reece v. State*, 878 S.W.2d 320, 325 (Tex.App.-Houston [1st Dist.] 1994, no pet.) (holding officer could testify, based on his training and experience, that a defendant's actions were consistent with selling cocaine); *Williams v. State*, 760 S.W.2d 292, 296 (Tex.App.-Texarkana 1988, pet. ref'd) (holding officer's testimony about the common use of vise grips to assist in stealing cars was admissible opinion testimony by a lay witness); *see generally* 2 STEVEN GOODE, ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE § 701.2 (3d ed.2002). Police often have to reconstruct crimes they did not witness. They do this by inferring the cause of an event they did not witness from facts and evidence they do know.[11] In fact, appellant does not dispute that Detective Reynolds could have explained his theory of the case via testimony. If Rule 602 does not bar his testimony describing the event, it should not bar the demonstration.

In short, Rule 602 does not bar the demonstration and, in fact, it is not the controlling factor in the demonstration's admissibility. Instead, case law contains the most commonly cited requirements for admission of demonstrations.

### 3. Case Law Generally Focuses on whether the Demonstration was Substantially Similar to the Event.

a. *What the proponent of the demonstration must show.*

Case law generally focuses on whether the demonstration was substantially similar to the event. *See, e.g., Valdez v. State*, 776 S.W.2d 162, 168 (Tex. Crim.App.1989) (en banc); *Cantu v. State*, 738 S.W.2d 249, 255 (Tex.Crim.App.1987) (en banc); *Key v. State*, 149 Tex.Crim. 200, 192 S.W.2d 563, 566 (1946). The proponent of the demonstration must show that the conditions under which the demonstration is conducted are sufficiently similar to the event in question. *Valdez*, 776 S.W.2d at 168; *Cantu*, 738 S.W.2d at 255. It is not essential that the conditions of the demonstration be identical; dissimilarities go to weight and not to admissibility. *See Valdez*, 776 S.W.2d at 168. All parts of the demonstration must be supported by the evidence or testimony. *See Cantu*, 738 S.W.2d at 255; *Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279, 281–82 (Tex.1964); *Ginther v. State*, 706 S.W.2d 115, 119–20 (Tex.App.-Houston [1st Dist.]

---

or the determination of a fact in issue." TEX. R. EVID. 701.

**10.** Detective Reynolds testified that he had worked for the Harris County Sheriff's Department for over twenty years, had been a detective for twelve years, and had been assigned to the Homicide Division for ten years, where he had been involved in investigating hundreds of homicides.

**11.** "Inference" has been defined as "[a] conclusion reached by considering other facts and deducing a logical consequence from them" and "[t]he process by which such a conclusion is reached." BLACK'S LAW DICTIONARY 793 (8th ed.2004).

1986, pet. ref'd). We review the trial court's ruling for abuse of discretion. *See Valdez*, 776 S.W.2d at 168; *Cantu*, 738 S.W.2d at 255. Out of necessity, reviews of trial court rulings on demonstrations depend on the facts of the case.

b. *This demonstration was supported by, and consistent with, the testimony.*

(i) *Undisputed facts.*

Many of the details of the scene were not disputed, and the State's demonstration accurately portrayed them. The State used the actual mattress that was the site of the stabbing. The participants portraying appellant and Jeff Wright, Ms. Siegler and Mr. Doyle, were shown to be of similar height and weight to appellant and her husband. Detective Reynolds testified that, based on his observations of Jeff Wright's body, the ligatures used to tie Mr. Doyle to the bed were substantially similar to the ones actually used, and appellant did not dispute this. The parties also did not dispute the general location and grouping of the stab wounds on Jeff Wright's body. Detective Reynolds testified to these facts based on his personal observations. As a result, appellant cannot validly complain that these details vary too greatly from the actual event.

(ii) *Disputed facts.*

Although some details were disputed, such as when appellant tied Jeff Wright with the ligatures and where on the bed they were tied, the main differences between appellant's version of her husband's death and the State's version are global in nature. Thus, the parties disagree as to how Jeff Wright came to have 193 stab wounds. The appellant says it was the result of a rape, the ensuing struggle, and a psychotic condition induced by the horror of the event; the State claims it was, plain and simple, a murder. With the only eyewitness being the defendant, the State had to reconstruct the progression of the event. As discussed in the previous section, the State did this by deductions from the clues given by the physical evidence and the statements and actions of the defendant.

For example, the deductions from the clues given by the physical evidence led to the prosecutor's positioning on the bed (supported by Detective Reynolds' testimony that Jeff Wright's body was discovered with tightly tied ligatures on his wrists and ankle, and that the large number of wounds on the front of his body indicated he had been restrained face-up).[12] The deductions also supported that part of the demonstration in which the male prosecutor's arms and one leg were tied to the bed posts.

◼ In short, all parts of the demonstration, both disputed and undisputed, were supported by facts in evidence. Detective Reynolds' testimony was based on his personal observations as well as his deductions. Given the State's evidence and the reasonable inferences that may be

12. The medical examiner who performed the autopsy on Jeff's body agreed with Detective Reynolds' conclusions, testifying that the presence of the ligatures and the fact that almost all of the stab wounds were on the front of the body indicated that Jeff Wright was restrained and was face-to-face with his killer. However, appellant points out that the medical examiner also testified that Jeff Wright's body had wounds on the hands that were consistent with defensive wounds, and he could not have gotten defensive wounds if his hands were tightly tied to the bed. Appellant also cites Detective Reynolds' admission that he did not see any bruises on Jeff Wright's wrists or ankles consistent with him struggling with the ligatures as depicted in the demonstration. However, such conflicts go to the weight of the evidence, not its admissibility. *See Valdez*, 776 S.W.2d at 168; *Cantu*, 738 S.W.2d at 255.

drawn from it, we find the demonstration was substantially similar to the actual event as theorized by the State. *See Valdez*, 776 S.W.2d at 168–69 (upholding in-court demonstration of six disarming techniques by which a person might take police officer's weapon when sufficient evidence supported inference that defendant was able to disarm officer and use his weapon to shoot him); *Stembridge v. State*, 94 Tex.Crim. 207, 250 S.W. 180, 181 (1923) (upholding demonstration in which State re-created how husband's body was found in bed and wife was asked to demonstrate how she claimed to have shot husband in self-defense); *see also United States v. Wanoskia*, 800 F.2d 235, 238 (10th Cir. 1986) (upholding in-court demonstration using estimate of length of deceased wife's arms to show she could not have shot herself as husband claimed).

c. *Appellant's cited cases do not require a reversal.*

Appellant cites a number of cases in which filmed or in-court demonstrations were held to be not substantially similar to the actual event and argues that they reveal the flaws in this demonstration. We find these cases distinguishable. The demonstrations in those cases were either plainly inaccurate or unsupported by any evidence.[13] Here, in contrast, all parts of the demonstration were supported by the State's witness, who testified to the physical evidence and made reasonable deductions from it. Appellant's claims of inaccuracy really only question those parts of the demonstration that were deductions from the evidence. The conflict, then, is largely over *when* and *how* Jeff Wright was restrained and stabbed, rather than *if* he was restrained and stabbed.

13. *See Cantu v. State*, 738 S.W.2d 249, 255 (Tex.Crim.App.1987) (en banc) (trial court properly refused to permit in-court demonstration to simulate lighting in room where murder occurred when differences between actual room and courtroom would affect crucial element of illumination); *Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279, 281–82 (Tex.1964) (finding reversible error in demonstration of filmed experiment to show light beam cast by locomotive, when position of lights, distances, and other matters was unclear and there was no evidence of candlepower of light); *Ginther v. State*, 706 S.W.2d 115, 119 (Tex.App.-Houston [1st Dist.] 1986, pet. ref'd) (holding trial court properly excluded video reenactment of arrest to show evidence would have blown out of vehicle when it failed to show position of vehicle's window and thus did not address crucial element of air disturbances); *Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 590 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.) (holding admission of filmed experiment of test vehicle to show design defect was error when plaintiff failed to show test vehicle had same characteristics as plaintiff's car); *United States v. Gaskell*, 985 F.2d 1056, 1060 (11th Cir.1993) (holding expert's demonstration of shaken baby syndrome using infant mannequin was not substantially similar when mannequin had to be shaken harder than in real life and number of oscillations of head needed to cause injury was unknown); *Carson v. Polley*, 689 F.2d 562, 579 (5th Cir.1982) (holding it was error to admit "similar" type knife allegedly found on plaintiff when it was not made clear admission was solely for illustrative purposes and therefore was prejudicial); *McGuire v. Nelson*, 162 Mont. 37, 508 P.2d 558, 562 (1993) (holding it was reversible error to permit in-court demonstration using furniture clamp applied to motorcycle to simulate force exerted by two riders when no evidence showed that force of clamp was similar to force of riders); *State v. Trahan*, 576 So.2d 1, 8 (La.1990) (holding videotape reenactment had no probative value when position of victim, which was crux of reenactment, was inconsistent with testimony); *State v. Philbrick*, 436 A.2d 844, 859–60 (Me.1981) (holding detective's demonstration using front seat and dashboard of car and mannequins to depict shooting was not substantially similar and overly prejudicial when car parts had been altered and their original positions were not verified, the mannequins were not shown to be physically similar to the defendant or the victim, and the detective was not qualified to opine as an expert on blood spatter evidence forming part of his opinions).

For example, appellant does not deny that, at some point, she stabbed him while he was on the bed. Under her version of events, after Jeff Wright raped her on their bed, he got back on top of her with the knife, and she wrestled it from him and began stabbing him in the neck and chest. When asked where she was while she was stabbing him, appellant testified: "Originally I was to the side. But then eventually I climbed over like he was on me because I couldn't stop stabbing him." Appellant then described where she repeatedly stabbed her husband:

> In his head, in his chest, and in his neck and in his stomach. And his leg from when he kicked me. I stabbed him in his penis for all the times that he made me have sex and I didn't want to. And I couldn't stop because he was going to kill me and I couldn't stop.

Appellant also admitted that she tied ligatures to her husband's limbs, but when she did it and why she did it conflict with the State's version of events. Appellant claimed that, after she had stabbed her husband several times, her son knocked on the bedroom door. Believing her husband was alive and that he would come after her again, appellant tied his right arm to the bed to restrain him while she checked on her son. She then testified that she returned to the bedroom and continued stabbing her husband, and when she finally stopped, she put her husband's body on a dolly and tied his ankles and left arm to the dolly to get the body out of the house.

Thus, there is no dispute that Jeff Wright was stabbed on the bed and that he was somehow restrained with ligatures; at the crux of the case is when he was restrained and how he came to be stabbed.

Supported by sufficient evidence, the State was entitled to demonstrate its theory for the jury, not only to show that a murder could have occurred as the State theorized, but also to show that the incident could not have happened as appellant contended. *See Valdez,* 776 S.W.2d at 168–69; *Stembridge,* 250 S.W. at 181; *Wanoskia,* 800 F.2d at 238–39.

d. *The demonstration is not invalid because it was based on reasonable inferences from the evidence.*

Appellant also maintains that the demonstration is not substantially similar to the actual event because Detective Reynolds had to "speculate" where on the bed the ligatures may have been tied. We already have held that this testimony is a reasonable deduction from facts in evidence; it was not "speculation." Detective Reynolds saw the ligatures tied to Jeff Wright's wrists and leg, at the death scene, at the morgue, and in photographs. Although Detective Reynolds admittedly did not know where on the headboard of the bed the ligatures were tied, it was reasonable for him to infer that appellant secured the ligatures to the bed in some fashion. *See Valdez,* 776 S.W.2d at 169. Moreover, the precise location where the ligatures were tied is an insignificant fact; the more important question is *when* appellant tied Jeff Wright's arms and legs. As we have noted, it is not necessary that the demonstration be identical to the event in every respect. *See id.* at 168; *Cantu,* 738 S.W.2d at 266; *see also Key,* 192 S.W.2d at 566 (holding minor differences in details of demonstration and actual event did not render reenactment substantially dissimilar).[14] Appellant has not cited

14. Appellant also argues the demonstration was inaccurate because Detective Reynolds testified that he did not know whether appellant and Jeff Wright were clothed, while in the demonstration, both participants were clothed. However, whether appellant and her husband were dressed is not an important aspect of the case, and portraying them

any cases, and we have found none, in which a court has held that the State cannot present its version of events based on reasonable inferences from the physical and other evidence. We see no reason why a demonstration based on reasonable deductions should not be allowed if it meets the criteria of the in-court demonstration case law and is not prejudicial under Rule of Evidence 403.

In conclusion, based on the State's evidence and the reasonable inferences drawn from it, we find that the State's demonstration of its theory of the case was substantially similar to the conditions of the actual event. We therefore overrule appellant's first issue.

### 4. The In–Court Demonstration Did Not Violate Rule 403.

■ We now turn to appellant's second issue, her claim that the demonstration deprived her of the right to a fair trial because it violated Rule 403 of the Texas Rules of Evidence. Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. TEX. R. EVID. 403. Evidence is unfairly prejudicial if it has "an undue tendency to suggest that a decision be made on an improper basis." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim.App.1991) (en banc) (op. on reh'g). A Rule 403 analysis by the trial court should include, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need

for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex.Crim.App.2004) (citing *Montgomery*, 810 S.W.2d at 389–90). We review the trial court's Rule 403 decision for an abuse of discretion, meaning it will be reversed only if it is outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex.Crim. App.2001). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim.App.2004) (en banc). We will consider each of the factors.

a. *The probative value of the in-court demonstration.*

■ Appellant contends that the first factor, the probative value of the in-court demonstration, weighs in her favor because the demonstration was not substantially similar to the events it sought to portray; a verbal description would have been sufficient. We already have determined that the demonstration was substantially similar to the State's version of the progression of events the night appellant killed her husband. As noted in the preceding discussion of Rule 602, the State's theory of how appellant killed her husband is supported by both the evidence and testimony explaining the reasons the State reached this conclusion. Being an accurate portrayal of the State's version of events, it had probative value; it enabled the jury to visually evaluate the plausibility of both the State's theory and appellant's self-defense claim. For example, it allowed the jury to see first-hand the relative height and weight of appellant and her husband, their ability to maneuver on or

---

clothed actually inured to appellant's benefit. *See Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim.App.2002) (en banc) (stating that, in determining whether photograph of victim is

unfairly prejudicial, reviewing court considers whether the body depicted is nude or clothed).

around the bed, and their ability to take defensive actions. The demonstration therefore conveyed the evidence more effectively than if a witness had merely described it. Thus, this factor weighs in favor of the admissibility of the demonstration.

Although appellant argues forcefully that this presentation was marred in the same way as the presentation in *United States v. Gaskell*, we disagree. In *Gaskell*, the Eleventh Circuit held that the probative value of an in-court reenactment by a prosecution witness demonstrating shaken baby syndrome using an infant mannequin was substantially outweighed by its potential for unfair prejudice. *See* 985 F.2d at 1061–62. But the reasons for this conclusion were many and were warranted. The court held the presentation was of slight probative value and overwhelmed by its unfairly prejudicial effects because (1) the weight of the mannequin's head was different than a live baby's head, (2) the flexibility and length of its neck was different, (3) the mannequin had to be shaken with "a considerably greater degree of force" to produce the head movement characteristic of shaken baby syndrome, (4) the witness's presentation was not shown to be based on reliable information, and (5) there was no evidence of the number of oscillations needed to produce the infant's injuries. *Id.* Thus, the court concluded that "the demonstration tended to implant a vision

of Gaskell's actions in the jurors' minds that was not supported by any factual basis for the demonstration." *Id.* at 1061. Here, we have no similar deviation from the evidence. The demonstration was adequately supported by the evidence and accurately depicted the State's claim that appellant killed her husband, not in self-defense, but intentionally. Consequently, we find *Gaskell* distinguishable.

b. *The in-court demonstration's ability to impress jurors irrationally yet indelibly.*

The second factor is the demonstration's ability to impress jurors in some irrational yet indelible way. Appellant contends this factor also weighs heavily in her favor. She compares the demonstration to a sensationalized murder scene in a provocative movie, urging that it bore only "a fleeting connection to reality." Its impact had the potential to mislead the jurors, she claims, and to cause them to decide the case on the basis of emotion rather than relevant evidence. The State responds that, although the demonstration may have impressed the jury, it did not do so in an irrational way. As we explain below, we agree with the State.

We recognize that courts have spoken to the dangers of filmed or in-court demonstrations that may have the potential to encourage jurors to resolve the material issues on an improper basis.[15] *See, e.g.,*

---

15. Appellant relies heavily on *Lopez v. State,* in which the Fort Worth Court of Appeals expressed its concern about the trial court's admission of a videotaped reenactment of the appellant's alleged participation in a marijuana transaction:

 While videotape recreations of criminal activities may be acceptable in some jurisdictions, the concept of recreating human events with the use of actors is a course of conduct that is fraught with danger. The general appearance of an actor, his facial expression or slightest gesture whether in-

tended or not may sway a juror who has listened to lengthy testimony. The danger of jurors branded with television images of actors, not testimony, is too great to ascertain. No court instruction could remove highly prejudicial evidence of a re-enacted rape or murder if we establish this precedent.
 651 S.W.2d 413, 414–15 (Tex.App.-Fort Worth 1983), *rev'd and remanded on other grounds,* 664 S.W.2d 85 (Tex.Crim.App.1983) (quoting *People v. Dabb,* 32 Cal.2d 491, 197

*Lopez v. Foremost Paving, Inc.*, 796 S.W.2d 473, 479 (Tex.App.-San Antonio 1990, writ dism'd) (noting the "powerful effect of videotape on jurors" and potential for confusion when films do not duplicate accident conditions with accuracy); *State v. Trahan*, 576 So.2d 1, 8 (La.1991) ("The strong impact of seeing an inaccurate re-enactment creates such a substantial possibility of prejudice that it is unlikely cross-examination could effectively point out the discrepancies."); *State v. Philbrick*, 436 A.2d 844, 859 (Me.1981) (noting that "[t]he persuasive power on juries of in-court demonstrative evidence is widely conceded," and therefore the trial court should exercise its discretion carefully). We also are mindful that, given its violent subject matter, this particular demonstration almost certainly did impress the jury.

(i) *Six aspects ensured that the demonstration and trial did not impress jurors irrationally and indelibly.*

■■■ But the question before us is not whether the demonstration "impressed" the jury. The question is whether it impressed the jury in an irrational yet indelible way. Several factors keep this demonstration from being one that would impress the jury in an irrational way.

First, this was not a reenactment or dramatic presentation *per se*. Nothing in the appellate record suggests that the two prosecutors attempted to re-create the struggle or the facial expressions of appellant and her husband that must have occurred when appellant stabbed her husband. *See Lopez*, 651 S.W.2d at 414–15 ("The general appearance of an actor, his facial expression or slightest gesture whether intended or not may sway a juror who has listened to lengthy testimony."). Nothing in the appellate record suggests that the prosecutors used gestures or their voices to portray the intensity of the scene. And although we do not rely on the DVD and cannot verify with 100% certainty that no facial expressions were used, the transcript does not create the impression that harmful expressions were used, and appellant does not point to facial expressions as being the problem. The purpose of this demonstration was to highlight the specific details that supported the State's theory that appellant murdered her husband.

Second, the demonstration was not intended to re-create the event in minute detail, showing where every blow landed and where appellant was when she inflicted each wound. This demonstration was intended to convey appellant's plan to kill Jeff Wright and generally how appellant accomplished her goal. When Detective Reynolds was asked to tie the ligatures to the headboard, he made it clear he did not know exactly where on the headboard they were tied. At the same time, he made it clear that, in his opinion, appellant had to have restrained Jeff Wright in some way and that the headboard—along with the

---

P.2d 1, 5 (1948)). Concluding that admitting the videotape was error, the court cautioned:
We find that any staged, re-enacted criminal acts or defensive issues involving human beings are impossible to duplicate in every minute detail and are therefore inherently dangerous, offer little in substance and the impact of re-enactments is too highly prejudicial to insure the State or the defendant a fair trial.
*Id.* at 416. The Court of Criminal Appeals has commented that it agrees in principle

with the concerns expressed in *Lopez*. *See Miller v. State*, 741 S.W.2d 382, 388 (Tex. Crim.App.1987) (en banc). However, as appellant admits, the Court of Criminal Appeals' comment was dicta because the claim was not preserved. Moreover, any precedential value *Lopez* may have is limited because the opinion on original submission was withdrawn and the appellant's conviction was reversed on other grounds. *See Lopez v. State*, 667 S.W.2d 624, 625 (Tex.App.-Fort Worth 1984, no pet.).

ligatures—was the most logical place and prop to be used for that.

Third, the demonstration appears to have been presented in a matter-of-fact, methodical manner. The purpose of the demonstration was two-fold: to depict how appellant killed her husband and to illustrate why the State reached this conclusion. The testimony focused on the details leading to this conclusion: the location of the wounds, the appellant's positioning to have made those wounds, the direction of the knife blade as it made the wounds, Jeff Wright's ability to move his arms and legs to defend himself if tied with the ligatures, and the height and weight of appellant and her husband.

Fourth, any juror confusion related to the ligatures was likely alleviated when the trial court instructed the jury that the State was not attempting to show the exact location where Jeff Wright's wrists were tied to the bed. *See Foremost Paving*, 796 S.W.2d at 480–81 (noting that "the offering party's affirmative acknowledgement [sic] to the jury of dissimilarities between a videotaped reconstruction and the actual occurrence can serve to alleviate unfairness").

Fifth, when appellant's counsel cross-examined Detective Reynolds, it was quite clear that Detective Reynolds (1) was not there when appellant killed Jeff Wright, (2) deduced how Jeff Wright was killed, and (3) did not know where on the bed the ligatures were tied because Jeff Wright's body was not on the bed when the police found it. Thus, the jury understood that the demonstration presented the State's theory of how Jeff Wright was killed. Moreover, appellant could have used the bed for her own demonstration of the night's events. But, she chose not to demonstrate what she claimed happened the night of Jeff Wright's death.

Sixth, in many ways, the demonstration was less graphic than the actual event. For example, although there were at least 193 stab wounds on Jeff Wright's body, Ms. Siegler did not attempt to re-create them all, but merely demonstrated the stabs generally, consistent with Detective Reynolds' testimony. The State also did not attempt to re-create the gruesome, bloody scene depicted in the photographs admitted into evidence. Nor was there any attempt to depict that portion of the State's theory that appellant was able to tie her husband to the bed by seducing him with candles and promises of sex. Nor was it misleading or confusing; rather, it depicted events relevant to appellant's guilt or innocence. *Cf. Reese v. State*, 33 S.W.3d 238, 242 (Tex.Crim.App. 2000) (stating that photograph tended to impress jury in irrational way when it showed much more than facts relevant to trial).

In short, although the demonstration surely was dramatic, these factors outlined above tethered each part of the demonstration to reality and to details that supported the demonstration. For these reasons, we find that the demonstration did not impress the jury irrationally and indelibly.

(ii) *Other aspects relied on by appellant do not alter our conclusion.*

Other aspects of the demonstration pointed out by appellant do not alter our conclusion. We are aware that the lead female prosecutor straddled a male prosecutor lying face-up on the bed to show how appellant accomplished the crime, and we are aware that the State claimed appellant was able to tie her husband by seducing him. However, this in itself does not invalidate the demonstration and give it an irrational aura. The questions were relevant and informational. There were no innuendos, no side-bar comments, no ex-

cessive illustrations of the stabs. When the prosecutor held the knife, it was to show how appellant most likely held it. When the lead prosecutor straddled the male prosecutor, it was to illustrate why the majority of Jeff Wright's wounds were on the front and left side of his head, neck, and chest area. The discussion was of a violent killing, not of a seduction scene.

We agree with appellant that the demonstration went to the heart of her case and that it hurt her defense. But all State's evidence, if effective, hurts a defendant's defense. The demonstration was supported by the evidence, and it is not rendered inadmissible solely because it may have been prejudicial to appellant's case; it must be "unfairly" prejudicial. *See Manning v. State,* 114 S.W.3d 922, 927–28 (Tex.Crim.App.2003) (noting that while evidence may be prejudicial, it may not be unfairly prejudicial). As the Court of Criminal Appeals explained in *Cohn v. State*: " 'Unfair prejudice' does not, of course, mean that the evidence injures the opponent's case—the central point of offering evidence. Rather it refers to 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " 849 S.W.2d 817, 820 (Tex.Crim.App.1993) (en banc) (citing 1 STEVEN GOODE, ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 403.2, at 93 (2d ed.1993)). And, any unfair prejudice must *substantially* outweigh the probative value of the demonstration. *See Robbins v. State,* 88 S.W.3d 256, 263 (Tex.Crim.App.2002) (noting that Rule 403 requires that danger of unfair prejudice must substantially outweigh probative value). This demonstration did not have the undue tendency to suggest decision on an improper basis.

In conclusion, this factor weighs in favor of admissibility.

c. *The time needed to develop the in-court demonstration.*

Appellant concedes this factor weighs in favor of admissibility, as the demonstration took less than twenty minutes.

d. *The State's need for the in-court reenactment.*

In resolving the fourth factor, the State's need for the staged in-court demonstration, we consider three subparts: (1) does the proponent have other available evidence to establish the fact of consequence that the evidence is admissible to show? (2) if so, how strong is that other evidence? (3) and is the fact of consequence related to an issue in dispute? *See Montgomery,* 810 S.W.2d at 390; *Reese,* 33 S.W.3d at 242. Appellant argues that this factor weighs in her favor because the State had numerous photographs and expert testimony to buttress its theory. She also contends the State did not need the demonstration to rebut her self-defense theory because she had not yet testified when the State presented it, and the State had available to it the less prejudicial alternative of cross-examining her.

The State largely concedes the first subpart, noting in its brief that it "[o]bviously" had other evidence with which to communicate its theory of the stabbing to the jury, including the testimony of Detective Reynolds and the medical examiner. However, the State emphasizes the effectiveness of the dramatic demonstration, and contends it had a compelling need for the demonstration to enable the jury to visually evaluate both the State's theory and appellant's defense on a relevant issue—whether Jeff Wright was restrained when appellant began to stab him or, as appellant testified, he was not. We agree that the demonstration was a much more forceful and clear illustration of the State's theory than mere testimony.

The jurors were able to see for themselves the difference in size between appellant and her husband. The jury was able to see how the ligatures worked—according to the State—and assess how plausible the State's theory was.

The photographs of Jeff Wright's body and the explanation given by Detective Reynolds and the medical examiner adequately explained the State's theory, but the demonstration almost certainly heightened the jury's comprehension of the theory. Although it is a close call, this factor favors the admissibility of the demonstration.

In summary, we find that all of the four factors weigh in favor of admissibility under Rule 403, and hold that the trial court did not abuse its discretion in permitting the demonstration on this basis. We overrule appellant's second issue.

## B. Issue Three: The Motion for Hearing and New Trial

In her third issue, appellant contends the trial court erred in denying her motion for a hearing and new trial based on "the prosecution's speculative and overly prejudicial bed demonstration." We disagree.

The right to a hearing on a motion for new trial is not absolute. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex.Crim.App.1993) (en banc). However, a defendant is entitled to a hearing on her motion for new trial if the motion and the supporting affidavits raise matters not determinable from the record that could entitle her to relief. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex.Crim.App.2003) (en banc). To be sufficient to entitle the defendant to a hearing, the motion for new trial and accompanying affidavits do not need to establish a prima facie case for a new trial. *Jordan v. State*, 883 S.W.2d 664, 665 (Tex.Crim.App.1994) (en banc). These documents need only reflect that reasonable grounds exist for holding that a new trial could be granted. *Martinez v. State*, 74 S.W.3d 19, 22 (Tex.Crim.App. 2002) (en banc). We review the trial court's decision not to hold a hearing on a motion for new trial under an abuse of discretion standard. *Wallace*, 106 S.W.3d at 106.

Appellant contends that a post-trial article in the Houston Chronicle raised matters not determinable from the record. Specifically, she alleges that the article demonstrates that the lead prosecutor, Ms. Siegler, acted in bad faith and contrary to her ethical duties as an officer of the court when she assured the trial court that the demonstration was not based on speculation and was not unfairly prejudicial. The March 13, 2004 Houston Chronicle article, entitled " *'Pushy' Wright Prosecutor knows Drama,*" describes Ms. Siegler as knowing the bed demonstration "would make good courtroom drama," and quotes her explaining that she did not attempt to demonstrate appellant stabbing Jeff Wright at least 193 times because "[f]irst of all, we don't know where she stabbed first. We don't know when she stopped and took a break. We don't know how the penis slices came in the middle of all this. I didn't go that far because I wasn't sure how that happened." [16] Appellant con-

---

16. The first five paragraphs of the article read as follows:

Kelly Siegler knows where to draw the line.

During a recent notorious murder trial, she knew it would make good courtroom drama to drag in a bloody mattress, tie her fellow prosecutor down and straddle him to illustrate how she believes a young mother killed her husband with 193 stab wounds.

But she also knew to limit her demonstration to just a few hypothetical jabs of the knife, following her gut feeling for what makes a box of 12 jurors skeptical.

tends this article demonstrates that Ms. Siegler knew the demonstration was based on speculation, and therefore appellant was entitled to a hearing to develop the issue. We disagree.

■■■ At most, the article reflects that Ms. Siegler did not attempt to re-create every aspect of the alleged murder because she did not know the exact order in which the wounds were inflicted on Jeff Wright or at what points appellant may have stopped or rested. Nothing in the article suggests that any part of the demonstration actually presented to the jury was inaccurate or based on speculation. The trial judge obviously witnessed the demonstration and ruled on appellant's objections to it and the supporting testimony of Detective Reynolds based on the evidence that was presented. We have determined that, based on the evidence, the demonstration was conducted under conditions substantially similar to the actual event. In this case, the exact order in which the injuries were inflicted or the moments at which appellant may have taken a break did not affect the admissibility of the demonstration. The newspaper article raised nothing that could not be determined from the record, and therefore appellant's motion failed to demonstrate reasonable grounds for a hearing on the issue of whether the demonstration was based on speculation. Accordingly, the trial court did not err in denying her motion for a hearing. *See Reyes*, 849 S.W.2d at 816 (reaffirming that a hearing is not required when the matters raised in the motion for new trial are subject to being determined from the record).

"If I had climbed up on the bed and tried to stab him 193 times, that wouldn't have worked," she explained last week, several days after securing a murder conviction and 25–year sentence for Susan Wright.

"First of all, we don't know where she stabbed first. We don't know when she

## C. Issue Four: The State's Allegedly Improper Reference to Punishment During Final Argument in the Guilt–Innocence Stage of the Trial

In her fourth issue, appellant contends the trial court erred in overruling her objection after the State allegedly made a reference to the issue of punishment during final argument in the guilt-innocence stage of the trial. We disagree.

### 1. The Standard of Review

■■■ The four general areas for proper jury argument are (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answers to argument of opposing counsel, and (4) pleas for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App.1999). The prosecutor may draw all reasonable inferences from the facts in evidence that are reasonable, fair, and legitimate. *Allridge v. State*, 762 S.W.2d 146, 156 (Tex. Crim.App.1988) (en banc). Error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record as a whole, the argument is extreme or manifestly improper. *Id.* at 155.

### 2. Analysis of the Prosecutor's Argument

During the prosecutor's rebuttal argument, the following exchange ensued:

The State: (Ms. Siegler) Can we just for a minute take a deep breath and look at this case with the fresh eye of common sense?

stopped and took a break. We don't know how the penis slices came in the middle of all this. I didn't go that far because I wasn't sure how that happened."
Andrew Tilghman, *'Pushy' Wright Prosecutor knows Drama*, HOUSTON CHRONICLE, March 13, 2004.

Don't think like a lawyer. Don't think like a cop. Don't think like a prosecutor. Don't think like a defense lawyer. Just use your common sense and think like a normal person.

Do you really think anything else happened in that bedroom when a body is discovered in a hole with ligatures around both wrists and around the ankle except for the fact that he was tied up, as hard as he could be tied up, and stabbed all over the front, not the back, same as a right-handed person would do, to a bed, perfect bedposts, 193 times.

And the only way that that could happen when a defendant is the size she is, and her husband was the size he was, was if she tied him up.

And to talk about self-defense under this scenario is a joke. Really, it's a joke.

And I want you to think about the reality of what the defense strategy is. Think about it really hard.

They tell you that their defense is self-defense.

No one really expects y'all to believe it's self-defense. But see, self-defense means you get to say battered wife. And you get to say, Jeff's a jerk, and Jeff's an abuser, and Jeff's all these horrible things.

See, that let's all that into evidence. You get it.

And why is that all important?

*Because tomorrow, when we talk again, you won't care about Jeff being killed. See. This pretty little beautiful blonde lady won't be punished as severely because Jeff is such a jerk. Who cares about what happened to Jeff.*

Defense: (Mr. Davis) Your Honor, this is totally improper. This is punishment argument.

The State: I'm talking about their strategy, Judge.

The Court: It's overruled.

The State: That's what's going on here.

Appellant contends the highlighted argument was improper because it told the jury to ignore its duty to decide appellant's guilt or innocence and get to the only real issue in the case—punishment. To support her argument, appellant cites *Cherry v. State*, 507 S.W.2d 549 (Tex.Crim.App. 1974), and *Kelly v. State*, 903 S.W.2d 809 (Tex.App.-Dallas 1995, pet. ref'd). In *Mann v. State*, the Court of Criminal Appeals explained that the prosecutors' comments in both *Cherry* and *Kelly* were improper because they essentially told the jury to ignore their duties to decide guilt or innocence because the only issue in the case was what punishment should be assessed to the defendant. *Mann v. State*, 718 S.W.2d 741, 744 (Tex.Crim.App.1986).

It is generally improper for the State to comment on punishment during the guilt-innocence stage of the trial. *See McClure v. State*, 544 S.W.2d 390, 393 (Tex.Crim.App.1976); *Cherry*, 507 S.W.2d at 549. However, not every reference to punishment at the guilt-innocence stage is improper. *Cf. Mann*, 718 S.W.2d at 744; *see also Barnes v. State*, No. 01–01–01086, 2002 WL 31388820, at *2 (Tex.App.-Houston [1st Dist.] Oct. 24, 2002, no pet.) (not designated for publication) (holding prosecutor's isolated argument referencing punishment was not improper because it was responsive to evidence in the record and was not intended to inflame the jury). We find that the prosecutor's argument here did not encourage the jury to ignore their duties to decide guilt or innocence, nor did it suggest that punishment was the only real issue. The prosecutor was urging the

jurors to be suspicious of appellant's claim of self-defense as a possible trial strategy ploy to get before the jury evidence of Jeff Wright's alleged bad character that otherwise would be inadmissible. Thus, the argument was in answer to opposing counsel's argument that appellant acted in self-defense and was a response to the presentation of appellant's case.

The prosecutor was not telling the jury to disregard the guilt-innocence stage because it was not important. To the contrary, she did not mention punishment again; she spent the remainder of her argument discussing the guilt-innocence evidence and focusing the jury on its duty to evaluate this evidence and render a verdict. We therefore find *Cherry* and *Kelly* distinguishable, and hold that the trial court did not err in overruling appellant's objection to the prosecutor's argument. We overrule appellant's fourth issue.

### D. Issues Five, Six, and Seven: The State's Allegedly Improper Arguments During the Punishment Stage

In her remaining three issues, appellant contends that, during the prosecutor's rebuttal argument in the punishment stage, the trial court erred in overruling appellant's objections to the prosecutor's allegedly improper arguments in three instances. Appellant contends the prosecutor's arguments were outside the record, were not reasonable deductions from the evidence, and injected new facts harmful to her case into the trial. We address each separately.

#### 1. "Take your fist back there and pound that wall as hard as you can."

In her fifth issue, appellant complains about the following exchange:

The State: (Ms. Siegler) Their domestic violence theory. That's absurd.

Guys, you know good and well if you took your foot and you kicked as hard as you could into another man's ribs, much less a woman, that man would be crippled up and going to a hospital. Y'all know that.

*Take your fist back there and pound that wall as hard as you can and tell each other that she wouldn't have had a broken bone.*

Defense: (Mr. Davis) Object, your Honor.

The State:—and a break—

Defense: Objection, your Honor. Fist back in the jury room.

The Court: Overruled.

The State: Think about it then.

 As an initial matter, the State contends that appellant failed to preserve error by failing to raise a sufficiently specific objection. *See* TEX. R. APP. P. 33.1(a)(1) (to preserve error, objection must be timely and specific unless specific grounds are apparent from the context). We agree. There are two main purposes for requiring a timely, specific objection: (1) to inform the trial court of the basis of the objection and give the trial court the opportunity to make a ruling on it; and (2) to give opposing counsel the opportunity to take appropriate action to remove the objection or provide other testimony. *Garza v. State,* 126 S.W.3d 79, 82 (Tex.Crim.App. 2004). Here, appellant's counsel simply objected to the argument and quoted the allegedly objectionable phrase. On appeal, appellant contends the statement was improper because it was outside the record and it encouraged the jurors to conduct an experiment. However, appellant did not inform the trial judge of either objection she now raises. Nor can we say that the nature of the objection now before us is apparent from the context and the circumstances presented. *See Heidelberg v.*

*State,* 144 S.W.3d 535, 542–43 (Tex.Crim. App.2004) (en banc) (holding appellant failed to preserve error when trial judge overruled objection without comment and record gave no indication of basis for objection asserted on appeal). We overrule appellant's fifth issue.

### 2. "[L]et God take them if it would bring Jeffrey back."

 In her sixth issue, appellant complains of the following argument:

> The State: (Ms. Siegler) Those of you who have kids, you know what you think. Y'all—y'all are lucky when you get to leave here later today or tomorrow and you get in your car and you drive away....
>
> *... And you know that Kay and Ron would stand up right now and let God take them if it would bring Jeffrey back. You know that.*
>
> Defense: (Mr. Davis) I'm—
>
> The State: They have to live—
>
> Defense: Object to that, Your Honor, that's not—that's—there is no evidence of that. Telling things she knows.
>
> The Court: It's overruled.

Appellant contends the above-highlighted argument was improper because neither of Jeff Wright's parents made the statement attributed to them by the prosecutor, and no reasonable deduction can be made from this non-evidence. However, we find the prosecutor's argument was an appeal to common knowledge. *See Nenno v. State,* 970 S.W.2d 549, 559 (Tex.Crim. App.1998); *Carter v. State,* 614 S.W.2d 821, 823 (Tex.Crim.App. [Panel Op.] 1981). In addition, Jeff Wright's parents testified to the extreme grief and pain they experienced from losing their son. Thus, the prosecutor's argument simply acknowledged the devastating effect Jeff Wright's

death had on his parents. We overrule appellant's sixth issue.

### 3. "To give them stability, not traumatic dealings with their murdering mother."

In her seventh issue, appellant complains about the prosecutor's argument that appellant should be given a lengthy sentence to keep her away from her children:

> The State: (Ms. Siegler) Give this family the opportunity to raise them normally, to provide for their college education like they've already started. *To give them stability, not traumatic dealings with their murdering mother.*
>
> *Give them the opportunity to raise Bradley and Kaily away from her until they are grown adults.*

To this argument, appellant objected that the argument was not proper because it "goes against the testimony of the ad litem."

 We hold that appellant's objection failed to preserve her complaint because the objection made at trial does not correspond to the arguments she raises on appeal. An objection stating one legal basis may not be used to support a different legal theory on appeal. *Cook v. State,* 858 S.W.2d 467, 474 (Tex.Crim.App.1993) (en banc); *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Crim.App.1990) (en banc). At trial, appellant objected that the argument was inconsistent with a witness's testimony; on appeal, she contends that the argument was outside the record, was not a reasonable deduction from the evidence, and injected new facts harmful to her into the trial. An objection that the argument conflicts with the evidence is different than an objection that the argument is outside the record. An argument may conflict with one witness's testimony but still be supported by other evidence or inferences

from other evidence. Therefore, nothing is presented for review. *See Rezac*, 782 S.W.2d at 871.

## II. Conclusion

In summary, we hold that the State's in-court demonstration of its theory of the case was conducted under substantially similar conditions to the actual event—as deduced by the State—and was not unfairly prejudicial in violation of Rules of Evidence 602 and 403. We further hold that the trial court did not err in denying appellant's motion for a hearing and new trial, because appellant failed to raise reasonable grounds for a hearing. Finally, we hold that the trial court did not err in overruling appellant's objections to the prosecutor's arguments during the guilt-innocence and punishment stages of the trial. We affirm the trial court's judgment.