# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00440-CR

**Celeste Beard Johnson, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT NO. 9020236, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Celeste Beard Johnson guilty of capital murder and injury to an elderly individual. *See* Tex. Pen. Code Ann. §§ 19.03(a)(3), 22.04(a)(1) (West Supp. 2005). The State did not seek the death penalty for the capital murder, and the district court sentenced appellant to life imprisonment. The jury assessed life imprisonment and a $10,000 fine for the injury to an elderly person.

Appellant contends that the evidence is legally and factually insufficient to sustain the guilty verdicts, and that the two convictions constitute double jeopardy. She also asserts that the trial court erred by: (1) overruling her motions to quash the original indictment, permitting the State to amend the indictment, and refusing to quash the amended indictment; (2) admitting irrelevant evidence; (3) threatening a defense witness and refusing to admit a prior consistent

statement by this witness; (4) limiting her right to confront the witnesses against her; (5) admitting in evidence a deposition given by appellant in a civil case; and (6) admitting summaries of telephone records prepared by the State.[1] Finding no reversible error, we affirm the judgments of conviction.

### *Evidence Sufficiency*

In six points of error, appellant urges that the State failed to corroborate the testimony of Tracey Tarlton, the accomplice witness whose testimony is essential to support the convictions. In four additional points of error relating only to the capital murder conviction, appellant asserts that the evidence is legally and factually insufficient to prove the alleged cause of death and that the murder was committed for remuneration.

### *Background*

Appellant met Steven Beard in 1993 while working as a waitress at the Austin Country Club, where Beard was a member. Beard's wife of forty-two years, who was seriously ill when he met appellant, died in October of that year. Appellant divorced her third husband, Jimmy Martinez, in April 1994, and Beard and appellant were married in February 1995. At the time of the marriage, appellant was thirty-two years old and Beard was seventy. Appellant had thirteen-year-old twin daughters, Kristina and Jennifer, from a previous marriage. Kristina was

---

[1] Appellant's initial appellate brief contained three points of error challenging the trial court's determination that she was not indigent and refusal to order the preparation of a free record. These issues became moot when other arrangements for payment were made. After the record was filed, appellant filed the brief raising the points we address in this opinion.

living with appellant in Austin, but Jennifer lived with her father in Washington. After appellant married Beard, Jennifer moved to Austin to join her mother and sister, and the girls were adopted by Beard following the death of their natural father. Beard was a man of considerable wealth, and the family lived in an expensive subdivision in a home Beard commissioned following his marriage to appellant.

In early 1999, appellant entered St. David's Pavilion, a psychiatric hospital, for treatment of depression. There, she met Tracey Tarlton, who was another female patient. The nature of the relationship between appellant and Tarlton was a matter of dispute at trial. Tarlton, a lesbian, testified that she loved appellant and believed appellant loved her. The defense, on the other hand, portrayed Tarlton as delusional and appellant as the object of Tarlton's obsessive behavior. It was undisputed, however, that appellant and Tarlton continued to see each other during the summer and fall of 1999, after they left Timberlawn.

At about 3:00 a.m. on October 2, 1999, Tarlton entered Beard's bedroom and shot him in the abdomen with a shotgun while he slept. The sound and pain woke Beard, who summoned emergency help. The first responders found Beard lying in bed holding his side. Appellant and Kristina were in another bedroom of the house at the time of the shooting.

Beard was taken to a hospital where he remained in intensive care for several weeks. As his condition gradually improved, he was moved to a regular hospital room and then to a rehabilitation center. Beard was discharged and sent home with appellant on January 18, 2000. The following day, appellant called Beard's doctor and demanded that he be readmitted to the hospital. After examining Beard, the doctor ordered him readmitted. Beard's condition deteriorated at the hospital, and he died on January 22, 2000.

3

Tarlton was arrested on October 8, 1999, and charged with injury to an elderly individual. The charge was increased to capital murder after Beard died. Tarlton ultimately pleaded guilty to murder and agreed to cooperate with the State in exchange for a twenty-year sentence. She testified for the State at appellant's trial. The jury charge authorized appellant's convictions solely as a party to Tarlton's conduct. *See* Tex. Pen. Code Ann. § 7.02(a)(2) (West 2003).

### *Tarlton's testimony*

Tarlton testified that she entered St. David's Pavilion in February 1999 for treatment of a bipolar disorder. She met appellant in the hospital and they became friends. Appellant told Tarlton that she had married Beard in order to secure the custody of her two daughters, but that she now felt trapped in a loveless relationship. Tarlton testified, "[H]er portrayal of what was going on was that she felt trapped by this man who was slowly killing her, slowly or quickly killing her, that she couldn't get out from under him psychologically or emotionally." Tarlton said she believed everything appellant told her about Beard. She said, "I just felt like he was this man who had a whole bunch of money and he pushed his way through all this staff of people and he pushed his wife around and he, you know, grabbed here and grabbed there and didn't have any concern at all for anybody else, including her."

Tarlton described appellant as flirtatious, and she said that they developed a romantic relationship while at St. David's. The two women arranged to be transferred to Timberlawn Hospital in Dallas, where they initially shared a room and where Tarlton said they first became sexually intimate. After a staff member saw Tarlton giving appellant a massage,

4

Tarlton was moved to a separate room. Appellant told Tarlton that Beard was responsible for their separation. Later, while outpatients at Timberlawn, appellant and Tarlton met in motel rooms and their relationship became more intense. After appellant and Tarlton returned to Austin, they continued to see each other regularly during the summer and fall of 1999.

Tarlton testified that appellant spent the night at Tarlton's house several times a week. Appellant told Tarlton that she put sleeping pills in Beard's food and replaced his vodka with Everclear, a product that is almost pure grain alcohol. In this way, she caused Beard to pass out, leaving her free to spend nights away from the house. Appellant also expressed the hope that this regimen would hasten Beard's death. She told Tarlton, "[H]e's an old man, he's going to die soon but not soon enough, and I'm just going to help him along wherever I can." Tarlton recounted a night in the fall of 1999 when she received a telephone call from appellant asking her to come to appellant's house. When Tarlton got there, she saw Beard unconscious at the dining room table. Tarlton helped appellant move Beard to the floor, then appellant placed a plastic trash bag over his head in an unsuccessful attempt to asphyxiate him. Appellant also attempted without success to poison Beard with botulin that she and Tarlton grew with instructions they found in a book of poison recipes. Tarlton explained that she was willing to help appellant in these schemes because "I did believe everything she told me about what was going on. And I just felt real bad for her, and . . . from what I knew, he was a terrible man and he wouldn't let her up."

Beard made plans to spend three weeks in Europe with appellant in October 1999. Appellant told Tarlton that she dreaded the trip and feared that Beard's emotional abuse would cause her to kill herself while on the trip. In late September, only a few days before the trip was to begin, appellant asked Tarlton to shoot Beard. Appellant knew that Tarlton had once hunted

and continued to shoot skeet, and that she owned a shotgun.  Tarlton said that she initially refused appellant's request, but she changed her mind when appellant threatened to commit suicide.  Tarlton testified that she asked appellant to take care of three things if she were arrested: find homes for her pets, pay her legal fees, and support her in jail.  Appellant promised to do so.

Tarlton testified that she met appellant at the Beard residence on the afternoon of Friday, October 1, to plan the shooting.  Appellant told Tarlton that she had arranged for Jennifer to be away from the house that night, but that appellant and Kristina would be at home and in another bedroom.  Appellant showed Tarlton where to park, how to enter the house, and where Beard would be sleeping.  When Tarlton mentioned that her shotgun would automatically eject the spent shell, appellant promised that she would find the shell and dispose of it.  Appellant suggested that Tarlton shoot Beard in the stomach, as that would be less messy.  She said that if Beard did not die immediately, she would wait for him to bleed to death before calling the police.  Later that night, appellant came to Tarlton's residence and told Tarlton to park in a different location in order to avoid being seen by neighbors.  She told Tarlton that Beard was already in bed asleep, and assured her that the house would be unlocked and the security system would be off.

Tarlton drove to the Beard residence shortly after 2:00 a.m. that night.  She found the gate open as planned.  She parked near the girls' bedroom and entered the house through an unlocked door near Beard's bedroom.  She then walked into the bedroom, shot Beard in the stomach, returned to her car, and drove away.  Tarlton did not dispose of the shotgun because it was personalized and she was confident that appellant would collect the spent shell as she had promised.  In fact, the spent shell was found by the police soon after they arrived at the house.

6

Without knowing this, Tarlton gave the shotgun to the police when they came to her house to question her. Tarlton was arrested a few days after the shooting and released on bail.

Tarlton said that she and appellant remained in contact during the weeks following the shooting. In addition to telephone calls, they often met in a park that was convenient to both the hospital and Tarlton's workplace. Shortly before Beard's discharge, appellant told Tarlton that she was not going to hire home health care workers because she intended to reinfect Beard's wound. After Beard died, most contact between Tarlton and appellant ended. Tarlton called appellant in June 2000 after not hearing from her for three weeks. Appellant told Tarlton that she did not want to talk to her. In July, Tarlton learned that appellant had remarried.

***Corroborating evidence***

Tarlton was an accomplice witness. A conviction cannot be had upon the testimony of an accomplice unless the testimony is corroborated by other evidence tending to connect the defendant with the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 1995). Corroboration is not sufficient if it merely shows the commission of the offense. *Id*. It is not necessary that the corroborating evidence directly connect the defendant to the crime or be sufficient in itself to establish the defendant's guilt. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Article 38.14 is satisfied if the combined weight of the nonaccomplice evidence tends to connect the defendant to the offense. *Id*.

Several witnesses, including appellant's daughters Kristina and Jennifer, testified that appellant made no secret of her dislike for Beard. Although appellant was pleasant to Beard in person, she called him various derogatory names behind his back and often expressed her wish

7

that he were dead. Appellant's daughters and their friends saw appellant substitute Everclear for vodka in Beard's drinks and mix sleeping pills into his food. They also described how appellant would give Beard sleeping pills instead of his other medications. Appellant was openly dreading the October trip to Europe with Beard. She told the receptionist at her beauty salon, "She hated the bastard. She wished he was dead. She didn't know how she would last on a vacation."

Most of Beard's assets, which at one time totaled over seven million dollars, were held in a revocable trust. At the time of their marriage, appellant and Beard signed a marital agreement by which Beard promised to give appellant one million dollars during the marriage. If the marriage ended in divorce, appellant would receive $500,000. In January 1997, Beard transferred $500,000 from his trust to a revocable trust created for appellant. This payment constituted one-half of the promised marital payment and also satisfied Beard's obligation to appellant should they divorce. The trustee testified that appellant's trust was depleted within six months of its creation. During October 1999 through January 2000, the four months following the shooting, appellant ran up expenses of more than $700,000 which were presented to the trustee of Beard's trust for payment. Under the terms of Beard's will, appellant inherited the residence and lake house and one-half of Beard's other assets.

Appellant's daughters were aware of her relationship with Tarlton. Kristina had a key to Tarlton's house and sometimes went there to wake up appellant when she spent the night. Employees of the book store managed by Tarlton also knew about the relationship. They testified that appellant often visited Tarlton at the store and described seeing them together at social functions. In July 1999, appellant hosted a party for the store's employees at the Beard lake house. Appellant was photographed at the party sitting in Tarlton's lap, and other party-goers

8

testified to seeing appellant and Tarlton kissing and holding hands. On the morning after the party, Kristina and her boyfriend, Justin Grimm, went to the lake house to clean up and found appellant and Tarlton together in bed.

Throughout 1999, appellant was also having an affair with her former husband, Jimmy Martinez. Kristina testified that she occasionally drove appellant to Martinez's house to spend the night, and that appellant instructed her on these occasions to tell Beard that she had slept in Kristina's room. In August 1999, appellant held a high school graduation party for the twins at Martinez's house.

Jennifer testified that on October 1, 1999, appellant suggested that she and her boyfriend, Christopher Doose, and another friend should spend the weekend at the lake house. This was the first time appellant had allowed Jennifer to use the lake house without first asking permission. The teenagers naturally accepted the offer. They testified that between 9:00 and 10:00 that night, appellant came to the lake house with Beard's dog, Megan. They were surprised to see Megan with appellant, as the dog was old and infirm and always slept with Beard. Appellant told them that Beard was drunk and had been hitting Megan. This, too, was unusual, because Beard was very fond of the dog and had never been known to mistreat her. They agreed to keep Megan with them at the lake house that night. Appellant, who seemed nervous and distracted, left the lake house sometime after 10:30 p.m.

That same night, Kristina and Grimm went to dinner and a movie. Although Kristina did not ordinarily have a curfew, appellant had instructed her to be home by midnight. They arrived at the Beard house at about 11:00 p.m. Grimm often spent the night at the Beard house with appellant's knowledge and permission, but appellant had told him earlier that he could

9

not stay that night. He left around midnight. Kristina testified that appellant was not at home when her boyfriend left and she went to bed. Kristina said that she awoke later that night and saw appellant standing in the doorway of her bedroom. Appellant told her that someone was at the front door and asked her to investigate. Kristina went to the front of the house and looked outside. She saw the lights of the emergency vehicles that had responded to Beard's call for help following the shooting.

The first responders found the gates to the property open and did not encounter any armed security devices. The doors of the house appeared to be unlocked. The first police officer to enter the house came in through a side entrance and found Beard. Then he walked to the front of the house to admit other emergency workers and encountered appellant and Kristina. When she was told that there was a medical emergency, appellant became hysterical. But the hysterics were "up and down." One officer remembered that appellant "would go from being very upset to not very upset and it seemed at times she was crying but there weren't any tears or anything like that."

Appellant and Kristina followed Beard to the hospital, where they were joined by Jennifer and Doose who drove in from the lake house. Officer Paul Knight spoke to the young people at the hospital and asked them if they knew who might have shot Beard. They immediately gave him Tarlton's name. Later that day, appellant, who did not know that they had already done so, instructed Kristina, Jennifer, and their boyfriends not to mention Tarlton to the police. Kristina testified that appellant also told her not to speak to the police, but only to appellant's attorney, and to tell the lawyer that appellant loved Beard and would never hurt him. After Beard

10

died, appellant told her daughters and their boyfriends that Beard's dying wish was that they not cooperate with the police investigation.

Acting on the tip from appellant's daughters, Knight and Officer Rick Wines interviewed Tarlton at her house on the afternoon of October 2. Tarlton gave the officers an exculpatory statement and allowed them to take her shotgun. Tarlton was arrested on October 8 after ballistics tests showed that the shell found in Beard's bedroom had been fired by her shotgun. While searching Tarlton's house, the officers found photographs of Tarlton with appellant and calendar entries describing some of their activities. Appellant said nothing to the police when she was told that Tarlton had been arrested.

On October 4, Knight and Wines went to the hospital to speak to Beard. Appellant met them there and told them that Beard did not wish to see them. She also revoked the consent she had previously given to search the Beard house. The following day, the officers found a sign posted outside Beard's hospital door saying, "No visitors including police." The sign also stated that no visitors were allowed except when appellant was present. After learning that a family friend had tried to visit Beard in the hospital, appellant telephoned him and angrily said that he "was not allowed to come back and visit Steve ever again."

Summaries of cell phone billing records introduced by the State document hundreds of calls between phones commonly, but not exclusively, used by appellant and phones used by Tarlton. Between August 29 and October 1, 1999, ninety-eight calls totaling 336 minutes were made between these phones, including eight calls totaling fifteen minutes on the day of the shooting. The calls continued following the shooting. Ninety-four calls totaling 389 minutes were

11

made between these phones from October 2, 1999, through January 26, 2000. When asked by her daughters why she was talking to Tarlton, appellant denied doing so.

In January 2000, Jennifer and Kristina had all the Beard telephone numbers changed in an effort to stop Tarlton's calls. On the day Beard died, however, Grimm found an unfamiliar cell phone in appellant's car. The evidence shows that this so-called "secret" cell phone belonged to Tarlton. The phone records show that approximately fifty calls were made between this phone and another cell phone belonging to Tarlton from January 8 to January 26, 2000. Another thirty-five calls were made between these phones from January 27 to June 15, 2000. Although the "secret" phone belonged to Tarlton, there was testimony that it was regularly seen at the Beard house and in appellant's possession.

Appellant, Kristina, Jennifer, Grimm, and Doose rode together in a limousine on the day of Beard's funeral. Appellant laughed and joked on the way to the funeral home, but her demeanor changed upon their arrival and she began to weep. After the funeral, appellant was again in a good mood. She had the limousine stop in a shopping center owned by Beard, entered one of the stores, and told the employees that she was now the owner and "they could kiss her ass like they kissed Steve's ass."

Soon after Beard's death, appellant hired Donna Goodson to be her personal assistant. Goodson testified that appellant "slept all day and partied all night." Goodson accompanied appellant on her frequent visits to Austin night spots and said that appellant became involved with several men, including a bartender named Cole Johnson who appellant later married. On February 10, 2000, Goodson went to the Houston rodeo with appellant. Appellant arranged dates for herself and Goodson while in Houston.

12

From Houston, appellant and Goodson continued on to Lake Charles, Louisiana, to visit a casino. During the Lake Charles trip, appellant told Goodson that her attorney had said "it would take two pieces of evidence to indict somebody for murder, one would be the gun and the other would be Tracey [Tarlton]." Goodson remarked that Tarlton might be cooperating with the police. Appellant asked Goodson if she knew anyone who could "get rid of Tracey." Goodson told appellant "anybody could get rid of anybody for the right amount." Upon their return to Austin, appellant gave Goodson $500 to hire a hit man to kill Tarlton. She also showed Goodson Tarlton's house and automobile. As time passed and Tarlton was not killed, appellant began to pressure Goodson. Goodson said she counseled patience and asked appellant for more money. Appellant made additional payments to Goodson of $2500, $2500, and $7460. Appellant tried without success to hide these payments. When Kristina asked appellant about the money she was giving Goodson, appellant became irate and threatened to "physically kill" her. Eventually, appellant told Kristina that she had hired a hit man to kill Tarlton but had "called it off."

We find the combined weight of the nonaccomplice evidence to be more than sufficient to connect appellant to the offense and thus to corroborate Tarlton's accomplice testimony. The evidence shows that appellant was unhappy in her marriage and often expressed the wish that Beard would die. In fact, appellant was shown to have regularly tampered with Beard's food and drink in a manner that was dangerous to his health. Appellant began spending lavishly even before Beard died, and she was noticeably elated following his death. While evidence of motive is alone insufficient to corroborate an accomplice, it is a circumstance that may be considered together with other corroborative evidence. *Leal v. State*, 782 S.W.2d 844, 852 (Tex. Crim. App. 1989); *and see Duff-Smith v. State*, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985)

13

(defendant's "extreme haste to enjoy the fruits of [deceased's] estate" considered corroborative of accomplice testimony).

Appellant had been intimately involved with Tarlton for over six months before Tarlton shot Beard. During the summer and early fall of 1999, appellant regularly spent the night at Tarlton's house, gave a party on her behalf, and often spoke to her on the telephone. In fact, appellant spoke to Tarlton several times on the day of the shooting. While this contact with the accomplice may not, in itself, be sufficient to corroborate Tarlton's testimony, it is corroborative when considered in light of the other evidence. *See Wincott v. State*, 59 S.W.3d 691, 698 (Tex. App.—Austin 2001, pet. ref'd).

Appellant's atypical behavior on the day of the shooting tends to connect her to the offense. She encouraged one of her daughters to spend the night of the shooting at the Beard lake house, and she took the dog that always slept with Beard to the lake house that night. After the shooting, appellant secretly remained in contact with Tarlton and attempted to keep Tarlton's name out of the investigation. Indeed, appellant was generally uncooperative with the police and encouraged her daughters and their friends to be the same. When it was suggested to appellant that Tarlton might cooperate with the police, appellant spent over $12,000 in an attempt to hire someone to kill Tarlton. Appellant's efforts to impede the investigation of Beard's shooting, and her attempts to first protect Tarlton and then to kill her, also tend to connect appellant to the offense.

Finding the evidence sufficient to corroborate the accomplice witness testimony, we overrule points of error four through nine. We now turn to appellant's further contention that even when Tarlton's accomplice testimony is considered, the evidence is legally and factually

14

insufficient to sustain the capital murder conviction. Appellant specifically contends that the evidence does not support the jury's verdict with regard to the cause of death and the remuneration element.

*Cause of death*

Appellant contends that the evidence is legally and factually insufficient to prove that Beard was murdered "by shooting him with a firearm" as alleged in the indictment. She argues that Beard's death was the result of an infection unrelated to the shooting.

Beard was originally taken to Brackenridge Hospital, where he was treated by Dr. Robert Coscia, a general surgeon and the hospital's director of trauma care. Coscia testified that Beard had a hole the size of an orange in his upper right abdomen and that bird shot had damaged several internal organs. Beard's colon was seriously damaged and posed an infection risk. Coscia removed a large portion of Beard's colon and created an ileostomy. Skin grafts were required to close the wound.

Beard remained in the hospital until December 7, 1999. By that time, his condition had improved enough for him to be transferred to the HealthSouth rehabilitation center. There, he received physical therapy preparatory to going home. Beard was released from HealthSouth on January 18, 2000. Beard was at this time confined to a wheelchair and experienced considerable pain whenever he was moved to a regular chair or bed. The ileostomy was still in place, and the gunshot wound itself required daily cleaning and observation. There is evidence that Beard had a rash in his groin area at the time of his discharge from HealthSouth.

15

On January 19, appellant called Dr. Coscia to complain about the quality of care Beard had received at HealthSouth. At her request, Coscia examined Beard in the Brackenridge emergency room. Coscia testified that Beard "did not look that bad," but he decided to admit him to the hospital for treatment of "a significant yeast infection in his perineum" or groin area. Beard was also reporting chest pain and his white blood cell levels were elevated.

At about 8:00 a.m. on January 22, Beard's chest pain worsened, his pulse rate went up, his blood pressure fell, his temperature spiked to over 102 degrees, and he became delirious. A blood test was positive for cocci, which indicated that Beard had a staphylococcal or streptococcal infection. An antibiotic was ordered but was not administered until 1:00 p.m. Beard died later that afternoon. The attending physician, who was not Dr. Coscia, recorded the cause of death as septic shock.

Dr Roberto Bayardo, the Travis County Medical Examiner, performed the autopsy on Beard's body. Bayardo testified that the immediate cause of death was pulmonary emboli. Bayardo was of the opinion that these emboli, or blood clots, had formed in Beard's legs as a result of the months of inactivity following the shooting. The emboli traveled to the lungs and lodged in the pulmonary arteries, blocking the flow of blood and preventing the oxygenation process. Bayardo identified photographs taken during the autopsy as showing large clots in Beard's pulmonary arteries. Bayardo testified that Beard also had bronchopneumonia and sepsis resulting from an infection that began in the lungs. Bayardo's autopsy report stated that the cause of Beard's death was pulmonary embolism and bronchopneumonia with sepsis, as a complication of the shotgun wound. Dr. Coscia testified that he agreed with Dr. Bayardo's conclusion regarding the cause of death.

16

Dr. Terry Satterwhite, an infectious disease expert called by the defense, testified that he had examined Beard's medical records from the time of the shooting. Satterwhite noted that blood tests taken on the morning of January 22 indicated that Beard had a group A streptococcal infection. Such bloodstream infections are very serious and often fatal. Beard also had numerous risk factors that increased the seriousness of the infection: he was obese, alcoholic, diabetic, and suffered from chronic obstructive pulmonary disease. Satterwhite opined that Beard died from septic shock resulting from the strep infection. Satterwhite believed that the strep entered Beard's body through the groin infection, and that Beard's death was not related to the shotgun wound.

Dr. Charles Petty, a forensic pathologist, also testified for the defense. Petty had examined Beard's medical records and the autopsy report prepared by Dr. Bayardo. He testified that the shotgun wound "was doing quite well, and there was no reason to suspect that he would die of that at all." Petty agreed with Satterwhite that Beard's death was caused by septic shock resulting from the streptococcal infection. Because he found no indication that the shotgun wounds were infected, Petty also believed that the infection began in the groin area and was unrelated to the wounds Beard suffered on October 2.

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981) (legal sufficiency); *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (factual sufficiency). In a legal sufficiency review, all the evidence is reviewed in the light most favorable

17

to the verdict, and it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Griffin*, 614 S.W.2d at 159 (citing *Jackson*, 443 U.S. at 318-19). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85; *see Johnson*, 23 S.W.3d at 11.

It was for the jury, as trier of fact, to resolve the conflicting expert opinions regarding the cause of Beard's death. Viewing the evidence in the light most favorable to the jury's verdict, and thus assuming that the jury believed the State's experts and discounted the testimony of the defense experts, the evidence is clearly sufficient to support a finding beyond a reasonable doubt that Beard died as a result of the shotgun wound inflicted by Tarlton on October 2. Even when all the evidence is considered equally, including the testimony of the defense experts, we still must give due deference to the jury's credibility determinations. The State's evidence is not so weak or the defensive evidence so strong as to preclude the jury from finding beyond a reasonable doubt that Beard died as a result of the shotgun injury. Points of error ten and eleven are overruled.

*Remuneration*

The indictment alleged that Beard was murdered "for remuneration and the promise of remuneration, namely, money and the estate of Steven Beard and the assets of a trust created by Steven Beard." *See* Tex. Pen. Code Ann. § 19.03(a)(3). Appellant argues that the State failed to prove this allegation because during Beard's life, she enjoyed financial benefits equal to or greater than the benefits to which she was entitled following his death. Appellant points to evidence that despite Beard's consternation at her lavish spending, he imposed no effective limit on it. Upon Beard's death, however, his assets passed into a trust for appellant's benefit and thus subjected appellant's spending to the supervision of a trustee who was less generous than Beard. Appellant asserts that "[a]t a minimum, remuneration implies an increase rather than a decrease in existing benefits."

We are not persuaded by this argument. The term "remuneration" as used in section 19.03(a)(3) "encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act." *Beets v. State*, 767 S.W.2d 711, 734 (Tex. Crim. App. 1988) (op. on reh'g). The conduct proscribed by section 19.03(a)(3) includes the killing of another person in order to receive, or for the purpose of receiving, some benefit or compensation. *Id*. (quoting *McManus v. State*, 591 S.W.2d 505, 513 (Tex. Crim. App. 1979)). The focus is on the actor's intent or state of mind: did she kill in the

expectation of receiving some financial benefit or compensation? *Id.* at 735. Thus, if appellant participated in Beard's murder for the purpose of receiving his money and other assets, she acted for remuneration even if she did not receive the expected financial benefit.

The evidence shows that appellant was familiar with the terms of Beard's will, under which she received the primary residence, the lake house, and one-half of Beard's other assets, which were worth several million dollars. But so long as he lived, Beard was free to change his will to leave appellant only the additional $500,000 to which she was entitled under the marital agreement, or to give appellant the remaining $500,000 during his lifetime and bequeath her nothing. Moreover, appellant had already received and spent the $500,000 to which she was entitled upon divorce under the terms of the marital agreement, and thus she could have been left with nothing had Beard divorced her. Although appellant told Tarlton that she had not married Beard for his money, she once told Tarlton that she did not divorce Beard "because she would only get $500,000." Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could find beyond a reasonable doubt that appellant solicited, encouraged, and aided Tarlton to kill Beard in order to secure Beard's assets and estate under the existing will. *See* Tex. Pen. Code Ann. § 7.02(a)(2). Even when all the evidence is viewed in a neutral light, including the restrictions that were imposed on appellant's access to Beard's estate, the jury was justified in finding beyond a reasonable doubt that appellant acted for the purpose of receiving the alleged remuneration.

In a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on proof of commission of the offense and that she was a party to its commission. Tex. Pen. Code Ann. § 7.03 (West 2003). Thus, the question arises

20

whether, in order to convict appellant as a party to capital murder for remuneration, it was necessary for the State to prove at appellant's trial that Tarlton, the primary actor, killed Beard for remuneration. *See Ex parte Thompson*, 179 S.W.3d 549, 555-57 (Tex. Crim. App. 2005) (construing penal code sections 7.02(a)(2) and 7.03). Assuming that such proof was necessary, we find that the evidence is legally and factually sufficient to supply it. Tarlton knew that Beard was a wealthy man, and the jury could reasonably infer that she knew that appellant was the primary beneficiary under Beard's will. Tarlton also testified that she and appellant would sometimes discuss their future lives together: "We went back and forth about it. But she had an idea that we would go and live at the lake house." From this, the jury could reasonably infer that Tarlton, as appellant's lover, anticipated that she would indirectly share the money and assets that would flow to appellant under the terms of Beard's will. Applying the relevant standards of review, we find that the evidence is legally and factually sufficient to support a finding beyond a reasonable doubt that Tarlton murdered Beard for remuneration.

Points of error twelve and thirteen are overruled.


### *Indictment*

Appellant contends that the trial court erred by overruling her motions to quash the original indictment, permitting the State to amend the indictment, and refusing to quash the amended indictment. Appellant argues that the indictment, both as filed and as amended, did not provide adequate notice of the accusation against her. *See* U.S. Const. amends. V, XIV; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 21.11 (West 1989). She further argues that by permitting the State to amend the indictment, the court violated her constitutional and statutory

21

right to have all material accusations presented to a grand jury. *See* U.S. Const. amends. V, XIV; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.05 (West 2005).

As filed in March 2002, count one of the indictment alleged without elaboration that appellant murdered Beard "for remuneration." In October 2002, appellant moved to quash the indictment because "[n]either the remuneration nor the remunerator is identified" and because it did not "identify what remuneration Defendant was supposed to have received from the unnamed remunerator."[2] In a letter to the parties dated November 27, 2002, the trial court stated that "the court is going to require the state to plead facts, acts or conduct that constitute solicitation and remuneration." The letter went on to state that the court would sign an order quashing the indictment on December 20. On December 19, the State moved to amend the indictment to allege that appellant murdered Beard "for remuneration and the promise of remuneration, namely, money and the estate of Steven Beard and the assets of a trust created by Steven Beard." Following a hearing on January 6, 2003, the court granted the motion to amend over appellant's objection, and conforming alterations were made to the face of the filed indictment.

Contrary to the allegation made in point of error one, the trial court did not overrule appellant's motions to quash the original indictment. To the contrary, it is clear from the record that the court would have quashed the indictment had the State not amended it. Because the indictment was amended, any question regarding the adequacy of the original indictment is moot. Point of error one is overruled.

---

[2] Appellant asserted other grounds for quashing the indictment, but she does not assert these other grounds on appeal.

22

Appellant argues that the amended indictment remained defective because it did not name the person providing the remuneration or the person receiving the remuneration:

> The amendment did not clarify whether "money" was to be paid by or to Appellant. If money was to be paid to Appellant, the amendment did not clarify who the payer was. If money was to be paid by Appellant, it did not clarify who was to receive it. Moreover, amending to allege that "remuneration" included "the estate of Steven Beard and the assets of a trust created by Steven Beard" was entirely uninformative. That addition did not clarify who was supposed to get the estate and the assets of a trust as remuneration, or who would provide it.

Appellant cites *Janecka v. State*, a capital murder case in which the indictment alleged that the defendant "committed the murder for remuneration and the promise of remuneration, namely, money." 739 S.W.2d 813, 816 (Tex. Crim. App. 1987). The court of criminal appeals held that the indictment did not give the defendant adequate notice because it did not allege the name of the person providing the remuneration. *Id*. at 820.[3]

*Janecka* was a murder for hire case. *See id*. at 835 (Teague, J., dissenting and summarizing underlying facts). It is reasonable in such a case to require the State to identify the alleged payor and payee in the indictment. But the cause now before us is not a murder for hire case. Instead, appellant was accused of murder for remuneration in its broader sense: the killing

---

[3] Appellant also cites *Lindsay v. State*, in which the defendant was indicted for conspiring to commit capital murder for remuneration. 588 S.W.2d 570, 571 (Tex. Crim. App. 1979). The court held that the indictment did not give the defendant adequate notice of the conduct she allegedly committed pursuant to the conspiracy. *Id*. at 572. The adequacy of the remuneration allegation was not at issue, and thus the opinion is not on point in the instant cause.

of another person in order to receive, or for the purpose of receiving, some benefit or compensation. *Beets*, 767 S.W.2d at 734. In such a case, the existence of a "culpable promisor" is not required to establish remuneration. *Id*. at 735. It follows that the amended indictment was not objectionable for failing to name the person who was to pay the alleged remuneration. At the same time, it is obvious from reading the amended indictment that appellant was the person to whom the alleged remuneration was to be paid. The trial court did not err by refusing to quash the amended indictment. Point of error three is overruled.

We also find no merit in appellant's complaint that the amendment of the indictment denied her the constitutional right to a grand jury indictment. The Fifth Amendment indictment clause does not apply to the states. *Hurtado v. California*, 110 U.S. 516, 520 & 538 (1884). The inferential requirements of article I, section 10 of the Texas Constitution were abolished by the adoption of article V, section 12(b), which provides that the practice and procedures relating to indictments, including amendment, "are as provided by law." *Studer v. State*, 799 S.W.2d 263, 272 (Tex. Crim. App. 1990). The requisites of an indictment now stem from statutory law alone. *Id*.

In general, an indictment may be amended as to form or substance at any time before the date the trial on the merits commences. Tex. Code Crim. Proc. Ann. art. 28.10(a) (West 1989). An indictment may not be amended over the defendant's objection, however, if the amended indictment would allege an additional or different offense or if the substantial rights of the defendant would be prejudiced. *Id*. art. 28.10(c). The State did not amend the indictment to allege a new or different offense. Both as filed and as amended, the indictment alleged the offense of capital murder for remuneration. *See Flowers v. State*, 815 S.W.2d 724, 728 (Tex. Crim.

App. 1991) (construing article 28.10(c)).  Nor did the amendment prejudice any substantial right. To the contrary, the amendment served to satisfy appellant's motion to quash demanding greater notice regarding the remuneration element.  Point of error two is overruled.

### *Relevancy Issues*

Appellant urges that the trial court erred by admitting evidence she deems to be irrelevant, unfairly prejudicial, and/or improper character-conformity evidence.  Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.  Tex. R. Evid. 401.  Although relevant evidence is generally admissible, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  Tex. R. Evid. 402, 403. Evidence of other crimes, wrongs, or acts is not admissible if it is relevant only to prove the character of a person in order to show action in conformity therewith, but it may be admissible for some other purpose.  Tex. R. Evid. 404(b).  We review the trial court's decision to admit evidence for an abuse of discretion.  *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g).

### *Beard divorce petition*

The State was permitted to offer evidence that Beard filed for divorce less than a year after marrying appellant, only to withdraw the petition two months later.  Contrary to appellant's argument, this evidence was relevant to the question of motive.  Under the terms of the marital agreement, appellant would have received upon divorce a relatively small settlement compared to what she was to receive under Beard's will.  Evidence that Beard had once filed for

25

divorce tended to show that appellant had a reason to fear that Beard might divorce her in the future and thus to hasten his death before he could do so. In her brief, appellant makes no effort to explain how this evidence had the potential to impress the jury in some irrational way so as to render it more prejudicial than probative. *See id.* at 390. No abuse of discretion is shown. Point of error fourteen is overruled.

### *Martinez divorce*

Appellant contends that the trial court erred by permitting the State to cross-examine Martinez regarding the details of his divorce from appellant. She also complains of the admission in evidence of the petition and decree from that divorce.

The record reflects that the petition and decree were offered by the State, but appellant's objection was sustained and they were not admitted. We also find nothing in the record to support her claim that the State was permitted to question Martinez about "the specific factual basis for the divorce." Finding no support for the contentions made, we overrule point of error nineteen.

### *Martinez affair*

Amy Cozart, a friend of appellant's daughters, testified that appellant told her that she was having an affair with Martinez, and that she did not want Beard to know about the affair because he might seek a divorce. Appellant was also fearful that her infidelity, if known, would effect her rights under the marital agreement. Cozart testified that appellant asked her to "lie for her" if Beard were to find out about the affair.

This evidence was also relevant to motive. Although her infidelity and her efforts to hide it cast appellant in a bad light, it was within the scope of the trial court's discretion to determine that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. We also note that Martinez, called as a defense witness, testified to the affair with appellant. Points of error fifteen and sixteen are overruled.

### *Anonymous letter*

State's exhibit 153A is a copy of an anonymous letter dated October 27, 1999, and addressed to Laylan Copelin, a newspaper reporter who was involved in the coverage of the Beard shooting. The letter purports to be written by a friend of appellant. It describes appellant as "one of the most giving people in the world" and her marriage to Beard as a "caring relationship with a husband that absolutely adores her." The letter contains an account of appellant's "difficult and traumatic life," including sexual abuse by her father, physical abuse by her first husband, and a number of diseases including ovarian cancer. The letter says that appellant befriended Tarlton because she had suffered "similar trauma issues," and that she had made it clear to Tarlton that "their friendship was nothing more than that." The letter laments that "[b]y the time we all started to see the signs of Tracey being obsessed with Celeste it was obviously too late." The letter concludes by saying that appellant "trusted someone who is crazy" and "feels tremendous guilt over the entire situation even though Steven has told her not to give it another thought." The letter pleads with Copelin to treat appellant fairly in his stories.

Kristina's boyfriend testified that he found the letter in a file saved on the Beard family computer. In his own testimony, Copelin confirmed receiving the letter. In addition to asserting that the exhibit was inadmissible under rules 403 and 404(b), appellant urges that the letter was hearsay and not properly authenticated. *See* Tex. R. Evid. 802, 901.

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Tex. R. Evid. 901(a). In addition to being found on the Beard computer, the letter contained numerous intimate details of appellant's life, confirmed by other evidence, that collectively support an inference that she was the author: her previous marriages, the suicide of her second husband, meeting Tarlton while both were receiving psychiatric treatment, the upcoming trip to Europe. Given these circumstances, it was a reasonable exercise of the trial court's discretion to conclude that the letter was written by appellant. *Id*. rule 901(b)(4); *see United States v. McMahon*, 938 F.2d 1501, 1509 (1st Cir. 1989) (applying Fed. R. Evid. 901(b)(4)); *United States v. Newton*, 891 F.2d 944, 947 (1st Cir. 1997) (same). And because the letter was shown to be written by appellant, it was not hearsay when offered against her. Tex. R. Evid. 801(e)(2)(A) (admission by party-opponent).

Defending the admission of the letter pursuant to rule 404(b), the State urges that the letter was an effort by appellant to influence newspaper coverage of the shooting and thereby to indirectly influence the police investigation. Thus, argues the State, the letter was relevant to show appellant's consciousness of guilt. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex.

28

App.—Austin 1990, no pet.) (attempts to suppress or fabricate evidence admissible as indicating consciousness of guilt). The opinions cited by the State involve evidence that the defendant sought to intimidate a witness. *See Wilson v. State*, 7 S.W.3d 136, 140-41 (Tex. Crim. App. 1999); *Torres*, 794 S.W.2d at 598-99. We are not persuaded that exhibit 153A is comparable evidence. On the other hand, appellant makes no argument in support of her assertion that the letter was prejudicial extraneous misconduct evidence. Given the volume of evidence introduced in this cause, we are satisfied that the admission of this exhibit, if error, did not harm appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). Point of error seventeen is overruled.

*Portrait*

Tarlton testified that appellant commissioned a painting of herself and her daughters that hung in the Beard residence. As described by Tarlton, the painting showed the three women sitting in a garden. In the corner of the garden was "a little fountain, and in the fountain there was a little tiny medallion that was the face of Steve Beard." Appellant told Tarlton "they had it included in the painting because they didn't want to hurt his feelings" and "they could just paint over it when he died."

The trial court overruled appellant's rule 404(b) objection to this testimony on the ground that it was relevant to show motive. This ruling was within the scope of the court's discretion. The court also did not abuse its discretion by concluding that the probative value of the evidence outweighed the danger of unfair prejudice. Point of error eighteen is overruled.

*Suicide pact*

Doose and Grimm testified that they, together with Kristina and Jennifer, were present when appellant had an emotional breakdown about two weeks after Beard died. They said that appellant was upset by the rumors that she was involved in Beard's death. She told them that she wanted to kill herself, but "didn't want to die alone and she wanted all of us to commit suicide with her." The young people tried to calm appellant and change the subject.

The court ruled that this testimony was relevant to show appellant's consciousness of guilt and that its probative value outweighed any unfair prejudice. We find the question to be close, but conclude that the trial court did not abuse its discretion in this ruling. We also note that the evidence can be viewed as favorable to the defense, in that it shows appellant as being so distraught by her husband's recent death and the resulting rumors as to contemplate the suicide of herself and her daughters. Point of error twenty is overruled.

*Comment regarding bank*

The trust holding the bulk of Beard's assets was managed by a Dallas bank. About a week after Beard's funeral, appellant went to Dallas to speak to bank officials. Goodson testified that upon her return, appellant told her that the bank was going to put her on a budget and limit her withdrawals from the trust. According to Goodson, appellant said she told the bankers, "Do you remember how you used to kiss my husband's ass? Well, you're going to have to learn to lick my asshole."

Appellant's reaction to the bank's proposal was relevant to the question of her motive. Although the remark was crude, the trial court did not abuse its discretion by concluding

30

that the probative value of the testimony outweighed any unfair prejudice. Point of error twenty-one is overruled.

*Dating*

Goodson testified that appellant began dating soon after Beard's death and saw several men socially, both in Austin and in Houston. The substance of this testimony was summarized earlier in this opinion. Appellant complains that the evidence was intended merely to suggest that appellant was immoral and thus more likely to be guilty.

The testimony describing appellant's active social life weeks after Beard's death, like the other evidence of appellant's good spirits at that time, tended to show appellant's attitude toward Beard and her motive for being involved in his death. The testimony tended to connect appellant to the offense and thus corroborated Tarlton's testimony. The evidence also tended to rebut the defensive theory that appellant, like Beard, was a victim of Tarlton's obsessive behavior. The admission of this testimony was not an abuse of discretion. Point of error twenty-two is overruled.

*Sexual advance*

Goodson testified that during the trip to Houston for the rodeo, she and appellant were in their hotel room when appellant made the comment that Goodson had large breasts. Goodson said that she responded by saying, "Yeah, you know, they're real." Goodson continued, "And then she ripped her shirt open and showed me hers and asked me did I want to feel them, and I said no."

The State defends the admission of this testimony by arguing that it rebutted the defensive theory that Tarlton was an unstable woman who attempted to entice appellant into a lesbian relationship, who misconstrued appellant's friendship as romantic love, and who killed Beard in the delusional belief that he was standing in the way of her relationship with appellant. Evidence that appellant made a sexual advance toward Goodson, urges the State, tended to corroborate Tarlton's description of her relationship with appellant as one of mutual sexual attraction.

While this testimony may have been marginally relevant, it nevertheless had a strong potential to impress the jury in an irrational, emotional way. But given the brevity of the testimony and the volume of other admissible evidence, we are persuaded that any error in the admission of this testimony over appellant's rule 403 objection was harmless. *See* Tex. R. App. P. 44.2(b). Point of error twenty-three is overruled.

### *Katina Lofton*

Katina Lofton was called as a defense witness to testify regarding statements Tarlton made to her while both women were incarcerated in the county jail. Appellant contends that the trial court violated her due process rights by threatening Lofton with perjury charges prior to her testimony. She also contends that the court erred by refusing to admit evidence of Lofton's prior consistent statement to rebut the State's claim of recent fabrication.

#### *Perjury admonishment*

Lofton was scheduled to be the first witness of the day. Before the jury was seated, the court called Lofton forward and told her, "I'm pretty concerned because I've read right here

32

what you told the Defense, right here, everything you told them, and I have right here what you told the State. I'm pretty angry." Lofton indicated that she did not understand the basis for the court's anger. The court told her, "I'm angry because I'm seeing two different stories that you've told the State and what you've told the Defense." The court told Lofton, "[W]e're not playing games in here," and warned her, "I just want to let you know that you do have to tell the truth and that if you don't tell the truth that you are subject to being charged with perjury. Okay? Aggravated perjury." The court told Lofton that with her record, she could receive twenty years in prison if she testified untruthfully. The entire colloquy between the court and Lofton consumes six pages in the record.[4]

Lofton was briefly removed from the courtroom. Defense counsel objected, "I think you came down on this witness, you intimidated the witness . . . ." The court responded, "When I know that somebody is going to come in here and lie, I need to read them the riot act and let them know that whatever they've told in the past they need to get up here and tell the truth, and I'm going to have her swear on the Bible. Not before the jury."

After Lofton was returned and sworn, and after the jury was seated, the court instructed defense counsel to call his next witness. Counsel called one of the defense medical experts. Out of the jury's hearing, the court told counsel that "[Lofton] is the first one on your list, and you are going to call her. She's listed. Now, call her and sit down and start." Counsel

---

[4] At oral argument, appellant asked permission to submit for the Court's consideration a video recording of the exchange between the trial court and Lofton excerpted from the television coverage of appellant's trial. Appellant subsequently tendered a DVD containing the recording. We decline to consider the recording over the State's objection because it is not part of the official record and because the reporter's record is adequate for our consideration of this point of error. *See Wright v. State*, 178 S.W.3d 905, 917 (Tex. App.—Houston [14th Dist.] 2005, pet. filed).

asked if he was being ordered to call Lofton, and the court said that he was. Counsel indicated that he would follow the court's order, but that he was no longer sure whether he wanted to call Lofton because "the Court has intimidated this witness." After counsel made it clear that he would call Lofton to the stand only if ordered to do so and that he did not intend to ask her any questions without first talking to her, the court ordered Lofton returned to jail. The court admonished defense counsel that he was not to speak to Lofton, adding, "She's not to have any contact with anybody, we'll just hold on to her, until this matter is resolved. . . . She is not to have any contact with anyone until I give—say she can." Later that morning, during a bench conference, the court told counsel for both parties that "Lofton will be available for either of you to talk to during the lunch hour. I would be careful, you know, just to make sure that she knows she needs to tell the truth. That's all I want. I don't care what the truth is."

Appellant contends that her due process rights were violated by the trial court's remarks to Lofton. U.S. Const. amends. V, XIV; Tex. Const. art. I, § 10.[5] She relies on the opinion in *Webb v. Texas*, 409 U.S. 95 (1972). In *Webb*, the trial court, on its own initiative, admonished the only defense witness, a prison inmate, "If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury." The court added that it was likely that any punishment the witness received for perjury would be cumulated with his current sentence. *Id*. at 96. After this admonishment, the witness declined to testify. The Supreme Court held that "the judge's threatening remarks, directed alone at the single witness for the defense, effectively drove that witness off the stand,

---

[5] Contrary to the State's argument, defense counsel's objection that the court was intimidating Lofton was sufficient to preserve this contention for appeal.

and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id*. at 98.

This Court has written that it is not inherently improper for a trial judge to advise a prospective witness of the penalties for perjury. *Davis v. State*, 831 S.W.2d 426, 437 (Tex. App.—Austin 1992, pet. ref'd). On the other hand, warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify. *Id*. at 438. Although "there is no bright line of demarcation between proper and improper perjury warnings," *id*., the trial court's admonishments to Lofton arguably crossed that line.

Lofton did not, however, decline to testify after receiving the court's admonishment. To the contrary, Lofton took the stand later that day. Lofton testified that during their jail conversations, Tarlton never told her that appellant had asked her to shoot Beard. Instead, Tarlton told Lofton that she shot Beard because he never cared for her. According to Lofton, Tarlton said that she called the Beard house immediately after the shooting and asked appellant to retrieve the shotgun shell. Tarlton told Lofton that appellant "was hysterical and just hung up." Lofton testified that Tarlton told her that she had made up the story about appellant manipulating her and that she was going to lie about appellant in order to get a twenty-year sentence. Tarlton told Lofton that she loved appellant but appellant did not love her, and that appellant "wasn't going to live happily ever after while she rot[s] in jail."

Appellant argues that even though Lofton testified, her due process rights were violated because the court ordered Lofton to testify and because the court's admonishments might have caused Lofton to shade her testimony or withhold testimony favorable to appellant. We are

35

not referred to any place in the record where the trial court ordered Lofton to testify, nor do we find any other indication in the record that Lofton's decision to testify was involuntary. Moreover, there is no evidence that Lofton's testimony was altered in any way by the court's admonishment. In January 2003, two months before appellant's trial began, Lofton gave a recorded, sworn statement to defense counsel. This statement, which is the subject of appellant's next point of error, appears in the record as court's exhibit fifteen. We have compared this statement to Lofton's trial testimony, and find no material differences. Indeed, the trial record indicates that defense counsel used the statement as a template for his questioning. We hold that the trial court's perjury admonishment did not violate appellant's due process rights because it had no effect on Lofton's trial testimony. Point of error twenty-four is overruled.

### *Prior consistent statement*

During Lofton's cross-examination, she acknowledged making statements to a prosecutor that were inconsistent with some of her trial testimony. Lofton also testified that she had met appellant in jail and maintained a correspondence with her. In one of Lofton's letters to appellant, she told her "there is no limit to what I wouldn't do for you." Lofton asked appellant for several favors, including money, support letters for her parole hearing, and legal assistance. Lofton admitted receiving $200 from appellant during the summer of 2002, about one year before appellant's trial began. Appellant had also given Lofton a gift of stationery and envelopes, and a friend of appellant had put $50 in Lofton's prison commissary account.

Following this cross-examination, appellant sought to introduce the transcribed statement Lofton gave to defense counsel in January 2003. The State's hearsay objection was

36

sustained. Appellant argues that the statement was not hearsay because it was consistent with Lofton's trial testimony and was offered to rebut the charge of recent fabrication. *See* Tex. R. Evid. 801(e)(1)(B). But to be admissible under this rule, the prior consistent statement must have been made before the alleged motive to fabricate arose. *Haughton v. State*, 805 S.W.2d 405, 408 (Tex. Crim. App. 1990). A consistent statement made after the motive to fabricate arose does not rebut the charge. *Id.* The record shows that Lofton's motive to fabricate arose in the summer of 2002, when appellant gave her $200 dollars and Lofton began writing letters to appellant asking for favors. Because Lofton's January 2003 statement was made after the motive to fabricate arose, it did not rehabilitate Lofton and was not admissible under rule 801(e)(1)(B). Point of error twenty-five is overruled.

### *Confrontation Issues*

Appellant contends that her right to confront the witnesses against her was violated by rulings limiting her cross-examination of Tarlton and excluding evidence regarding Tarlton's relationship with a woman named Zan Ray. Appellant makes the same arguments with respect to Tarlton's encounter with a man named Reginald Breaux.

A criminal defendant is constitutionally entitled to confront the witnesses against her. U.S. Const. amend. VI, XIV; Tex. Const. art. I, § 10. As part of this right, a defendant must be given great latitude to show any fact that might tend to affect a witness's credibility, including ill feeling, bias, or motive. *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). At the same time, a trial court has discretion with respect to the extent of cross-examination and the admission of evidence

generally, and its decision will not be disturbed absent a clear abuse of discretion. *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1997).[6]

*Background*

Tarlton had a relationship with Zan Ray before she met appellant. Outside the jury's presence, Ray testified that she was Tarlton's Alcoholics Anonymous sponsor. When Ray's husband committed suicide, Tarlton was very supportive and the two women soon began a romantic relationship. Ray said that she had never before had a sexual relationship with a woman, and she described her relationship with Tarlton as "trauma bonding." Ray said that the relationship ended about one year after it began when Tarlton resumed drinking and was arrested for assault. The trial court did not permit Ray to testify before the jury, and appellant complains that the court also refused to permit her to cross-examine Tarlton concerning her relationship with Ray.

Reginald Breaux was the man Tarlton allegedly assaulted. Breaux testified outside the jury's presence that on September 16, 1998, he was standing in front of a convenience store waiting for a bus when Tarlton stopped and offered him a ride in her car, which he accepted. Breaux said that Tarlton appeared to have been drinking. She gave him money to purchase a six-pack of beer at the convenience store. They then drove around drinking the beer. Eventually,

---

[6] Although appellant did not expressly refer to the Sixth Amendment, we believe that the arguments advanced during her many attempts to introduce this evidence were sufficient to make the trial court aware of her complaint. *See* Tex. R. App. P. 33.1(a)(1)(A). We decline the State's invitation to dispose of these issues on the ground that they were not preserved for review.

38

they returned to the convenience store and Tarlton parked. Breaux said that Tarlton then took an open knife from her pocket. He took the knife from her and she began to curse him. Breaux got out of the car and, as he walked toward the store, Tarlton struck him with her car, leaving him with a deep thigh bruise but no serious injury. When cross-examined by the State, Breaux admitted that he did not tell the police officers who investigated this incident that Tarlton had been armed with a knife. He also acknowledged having several convictions for burglary of a vehicle, unauthorized use of a vehicle, possession of cocaine, theft by check, and assault.

Tarlton also described this incident outside the jury's presence. According to her, Breaux became belligerent when she returned to the convenience store and told him that he had to get out of the car. As he walked away, Breaux said something she did not understand and then threw a beer can at her car. When Tarlton tried to drive away, Breaux jumped in front of her car and was struck.

It was undisputed that Tarlton was arrested for assaulting Breaux, but the charge was later dismissed. The trial court did not permit Breaux to testify before the jury and did not allow appellant to cross-examine Tarlton about this incident.

Appellant called three experts to testify regarding Tarlton's mental status: Susan Millholland, a counselor who conducted individual therapy sessions with Tarlton while she was at Timberlawn in March 1999; Dr. Howard Miller, a psychiatrist who was Tarlton's attending physician at Timberlawn; and Dr. Jerome Brown, a clinical psychologist who had studied Tarlton's medical records dating from September 1998 but had never treated her. These witnesses were permitted to testify to their professional assessments of Tarlton's mental health, but appellant was not allowed to question them about statements Tarlton made to them regarding the Breaux

39

incident.  Appellant was also not allowed to question Dr. Richard Coons, a psychiatrist called by the State, about this incident.

*Discussion*

It was undisputed that Tarlton's renewed drinking and her assault arrest led her to enter St. David's Pavilion in the fall of 1998, where she later met appellant.  Appellant argues that the trial court abused its discretion by refusing to allow her to cross-examine Tarlton and the mental health witnesses about the reasons she committed herself to St. David's, or to offer Ray's and Breaux's proffered testimony about this subject.  Appellant relies on the opinion in *Virts v. State*, 739 S.W.2d 25, 30 (Tex. Crim. App. 1987), in which the court held that a defendant should have been permitted to cross-examine an accomplice witness regarding the witness's history of psychiatric problems.  The court was of the opinion that the excluded cross-examination might have aided the jury's consideration of the accomplice's credibility.  *Id.*

This cause is readily distinguishable from *Virts*.  Appellant's cross-examination of Tarlton consumes over three hundred pages of the reporter's record, and much of it concerned Tarlton's psychiatric history.  By this cross-examination and through the testimony of the defense experts mentioned above, appellant was able to show that in late 1998 and early 1999 Tarlton was clinically depressed, suicidal, and delusional.  Millholland testified that Tarlton was difficult to work with because she was untruthful at counseling sessions.  Millholland also testified that after appellant and Tarlton were given separate rooms at Timberlawn, Tarlton told her that this problem

40

"would be solved if certain people met with untimely deaths." Miller testified that Tarlton was suffering from bipolar disorder and had a delusional belief that Beard "was the bad guy who was pulling Celeste away from her and making trouble in Tracey's life." Brown testified that his review of the medical records led him to conclude that Tarlton had a "pathological obsessive attachment" to appellant. He agreed with Miller's diagnosis of bipolar psychosis.

This brief summary of the expert testimony demonstrates that appellant was given a full opportunity to offer evidence regarding the mental-health issues relevant to Tarlton's credibility as a witness. Furthermore, and contrary to the specific complaints made in appellant's brief, the trial court did not deny her the opportunity to cross-examine Tarlton regarding her relationship with Ray as it related to her admission to St. David's. The court ruled, "I will allow you to ask if she went into St. David's because of the breakup of her relationship with Zan Ray." The court also allowed appellant to cross-examine Tarlton regarding her alleged "recruitment" of Ray into a lesbian relationship. Tarlton denied this, but she acknowledged that she had a history of entering relationships with married women that ultimately failed. Although appellant was not allowed to cross-examine Tarlton regarding the details of her relationship with Ray, and the court also refused to admit Ray's proffered testimony summarized above, appellant's brief does not specifically address these rulings, and she offers no argument that they were an abuse of discretion. Point of error twenty-six is overruled.

We also find no abuse of discretion in the trial court's refusal to permit evidence of the Breaux incident. With an exception not applicable here, the credibility of a witness may not be impeached by proof of specific instances of conduct. Tex. R. Evid. 608(b). With regard to appellant's broader argument that she was entitled to show why Tarlton entered St. David's in

41

1998, the record shows that the jury was fully aware of Tarlton's psychiatric history and of her diagnosis in 1998. The details of the Breaux incident were, in themselves, of little or no relevance to any material issue in the case, and the trial court could reasonably conclude that any probative value of the evidence was outweighed by the danger of undue delay and confusion of the issues. Tex. R. Evid. 403. Point of error twenty-seven is overruled.

### *Deposition*

Appellant urges that the trial court erred by permitting the State to introduce in evidence a videotaped deposition she gave in a civil suit filed by Beard's three children after his death. The children asserted that appellant was responsible for Beard's death and sought a temporary injunction to prevent appellant from wasting the assets of Beard's estate. Appellant was deposed by counsel for the plaintiffs in August 2000. Two months later, the case was non-suited and the cause was dismissed.

Evidence rule 804 provides exceptions to the hearsay rule when the declarant is unavailable to testify. Tex. R. Evid. 804. One of the exceptions is for the testimony of a witness at another hearing of the same or a different proceeding. *Id*. rule 804(b)(1). In a criminal case, the party against whom the testimony is offered must have had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination at the prior hearing. *Id*. The rule further provides that the use of depositions in criminal cases is controlled by chapter 39 of the code of criminal procedure. *Id*.; *see* Tex. Code Crim. Proc. Ann. arts. 39.01-.14 (West 2005 & Supp. 2005).

Chapter 39 has detailed provisions governing when and how a deposition may be taken in a criminal case. *See* Tex. Code Crim. Proc. Ann. arts. 39.01, .02 (West Supp. 2005), art. 39.03 (West 2005). It has been held that, unless the requirements of chapter 39 were complied with, a civil deposition is inadmissible in a criminal prosecution. *State v. Roberts*, 909 S.W.2d 110, 114 (Tex. App.—Houston [14th Dist.] 1995), *vacated on other grounds*, 940 S.W.2d 655, 660 (Tex. Crim. App. 1996).[7] Appellant contends that the deposition she gave in the civil suit was inadmissible under rule 804(b)(1) because it was not taken in compliance with the requirements of chapter 39. She also contends that she was not shown to have had the same motive and opportunity to develop the testimony at the deposition.

There is no question that appellant's civil deposition was not taken in compliance with chapter 39. As another court of appeals has explained, however, chapter 39 applies to the use of civil depositions in criminal proceedings only through rule 804(b)(1). *Kemmerer v. State*, 113 S.W.3d 513, 518 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Rule 804(b)(1) creates an exception to the hearsay rule and has no application if the declarant's out-of-court statement is not hearsay. *Id.* A statement is not hearsay if it is offered against a party and is the party's own statement. Tex. R. Evid. 801(e)(2)(A). Because appellant's civil deposition was not hearsay when offered against her, rule 804(b)(1) was inapplicable and any noncompliance with the rule,

---

[7] The court of criminal appeals vacated the judgment of the court of appeals on the ground that the State was not entitled to appeal the order excluding the deposition. *State v. Roberts*, 940 S.W.2d 655, 660 (Tex. Crim. App. 1996). The court later reconsidered the scope of the State's right of appeal and overruled its holding in *Roberts*. *State v. Medrano*, 67 S.W.3d 892, 901 (Tex. Crim. App. 2002).

including the incorporated requirements of chapter 39, was irrelevant. *Kemmerer*, 113 S.W.3d at 517-18. Point of error twenty-eight is overruled.

### *Summaries of Telephone Records*

The billing records for eleven cell phone numbers, all billed to either Beard or Tarlton, were introduced in evidence as State exhibit 185. These records documented thousands of calls made between May 1999 and July 2000. Annetta Black, a forensic analyst employed by the State, prepared six spreadsheets summarizing these records, which were introduced in evidence as State exhibits 179 through 184. Exhibits 179 and 180 show all of the calls made to or from the billed numbers. Exhibits 181 through 184 show only calls between phones associated with Tarlton and appellant. The spreadsheets were introduced pursuant to evidence rule 1006, which provides that the contents of voluminous writings, otherwise admissible, that cannot conveniently be examined in court may be presented in the form of a chart or summary. Tex. R. Evid. 1006.

There is no dispute that the requisites of rule 1006 were facially satisfied: the phone records were voluminous, admissible, and made available to appellant for examination and copying. Nevertheless, appellant contends that rule 1006 was misused in this cause because the spreadsheets did not accurately summarize the actual billing records and contained additional, unsupported material that was no more than the State's view of the case masquerading as evidence. She further argues that because of the misleading nature of the spreadsheets, their admission violated rule 403. Appellant relies on the opinion in *Wheatfall v. State*, 882 S.W.2d 829, 839 (Tex. Crim. App. 1994). In that case, the State introduced a purported summary of the

44

defendant's violent criminal history for which there was no supporting documentation. *Id*. at 838 & 839 n.10. The court of criminal appeals held that rule 1006 does not permit the State to "summarize [its] case on legal paper and submit those documents to the trial court as 'evidence.'" *Id*. at 839.

Appellant asserts that the spreadsheets were inaccurate and misleading in three respects: they showed calls made to land line numbers for which the State did not have billing records, they showed calls between the cell phones that were not reflected in the billing records, and they identified certain phone numbers as belonging to persons who were not named in the billing records. We will first describe the spreadsheets in greater detail, then address each of the alleged inaccuracies.

Each spreadsheet has a column for each of the eleven cell phone numbers for which there were billing records. At the top of each column is the telephone number and a name linking the number to either appellant, Tarlton, Beard, Kristina, or Jennifer. The billing records reflect that two of the cell phone numbers were billed to Tarlton. On the spreadsheets, however, Tarlton's name is linked to only one of these numbers. The other number is identified as being for appellant. The other nine cell phone numbers were billed to Beard, but in the spreadsheets his name is attached to only one of the numbers. Of the other numbers billed to Beard, four are identified as belonging to appellant, two are linked to Kristina, and two are shown to be Jennifer's. Each spreadsheet also has five additional columns for five land line phone numbers for which the State did not have billing records. One of these numbers is identified as being Tarlton's home number, two as being Tarlton's work numbers, and two as being the Beard home phone numbers. Each line in the spreadsheets shows an incoming call to or outgoing call from

one of the sixteen phone numbers, with its date, time, and duration. When a call was made from one number on the spreadsheet to another, the line shows both the outgoing call from the first number and the corresponding incoming call to the second number.

We first address the five land lines. Black testified that although she did not have the land line billing records, each call shown being made to one of the land lines was documented in the cell phone billing records.[8] In other words, the billing records for one of the cell phones showed that the phone had been used to make a call to one of the land line numbers. Our examination of the spreadsheets confirms that for every call shown as being made to a land line, there is a corresponding call made from a cell phone. Thus, although the State did not have the land line billing records, the spreadsheets accurately summarize cell phone billing records reflecting calls to the land lines.

Appellant's second complaint has to do with calls made between two of the billed cell phone numbers. Appellant has identified a relatively small number of instances (but she claims there could be more) where the spreadsheets show that a call was made between two phones, but the call is documented in the billing records for only one of the phones. For example, the spreadsheet shows that a call was made from cell phone A to cell phone B, the billing records for cell phone A confirm that the call was made to cell phone B, but the billing records for cell phone B do not reflect the receipt of the call. Black acknowledged this anomaly in the billing records and could not explain it. Nevertheless, Black insisted that there is a billing record for every call shown in the spreadsheets, and appellant makes no showing to the contrary. The

_____

[8] There are no entries in the spreadsheets for calls from a land line number to a cell phone number.

46

anomaly identified by appellant goes to the accuracy of the billing records themselves—an issue that is not before us—rather than to the accuracy of the spreadsheet summaries of the billing records.

Appellant's final complaint regarding the spreadsheets concerns the names associated with the various phone numbers. Tarlton identified the three land lines shown in the spreadsheets as her home and work numbers. She also testified that one of the cell phone numbers billed to her, and identified in the spreadsheets as being her number, was the phone she regularly used. Tarlton testified that the other cell phone billed to her was purchased in January 2000 after appellant's daughters changed all of the Beard telephone numbers. She testified that this phone, which is identified in the spreadsheets as being used by appellant, was kept by appellant and used by her to call Tarlton. Consistent with this testimony, the spreadsheets show no activity for this phone number until January 2000. Other testimony shows that this was the so-called "secret" cell phone discovered in appellant's car on the day Beard died and later seen in appellant's possession.

Jennifer and Kristina identified the two land line numbers shown in the spreadsheets as the Beard home phones. They also testified that, as shown in the spreadsheets, one of the cell phone numbers billed to Beard was his car phone, one was appellant's car phone, two were appellant's primary cell phone (before and after the number was changed), two were Jennifer's cell phone (before and after the number was changed), and two were Kristina's cell phone (before and after the number was changed). They acknowledged that the members of the Beard household sometimes used each other's cell phones.

47

The last cell phone number billed to Beard, shown in the spreadsheets as being used by appellant, was not identified by any witness. The exhibits reflect no activity for this number until April 2000, well after the critical time period in this cause. Obviously, this phone could not have been used by Beard, who died in January 2000. Neither Jennifer nor Kristina could identify the number, from which it can be inferred that neither of them used the phone. This inference is also supported by evidence that by April 2000, the twins were estranged from appellant and no longer lived or communicated with her. The circumstantial evidence therefore supports the identification of this number with appellant.

Contrary to appellant's argument, the identification of the various telephone numbers with a particular person in the spreadsheets was not merely the State's interpretation of the billing records. Instead, there is evidence linking each telephone number to the person identified. This distinguishes this cause from *Wheatfall*, where there was no testimony to support the purported summaries. 882 S.W.2d at 838. Although this supporting evidence was outside the summarized telephone records, we do not believe that this rendered the spreadsheets inadmissible under rule 1006. *See Rodriguez v. State*, 90 S.W.3d 340, 373-74 (Tex. App.—El Paso 2001, pet. ref'd) (inclusion of certain conclusions and characterizations did not render record summaries inadmissible).

The trial court's admission of exhibits 179 through 184 has not been shown to be an abuse of discretion. Points of error twenty-nine through thirty-five are overruled.

***Double Jeopardy***

48

Appellant contends that her convictions for both capital murder and injury to an elderly person constitute double jeopardy. *See* U.S. Const. amends. V, XIV. The Fifth Amendment guarantee against double jeopardy is enforceable against the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 874, 787 (1969). That guarantee protects against a second prosecution for the same offense after a conviction or an acquittal, and against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). It is the latter protection that is asserted here. Although appellant also cites the double jeopardy clause of the Texas Constitution, she does not argue that the protection it affords differs from that afforded by the United States Constitution. *See* Tex. Const. art. I, § 10.

Appellant raised the double jeopardy issue in the trial court after the jury's guilty verdicts were returned but before the punishment phase began. Appellant urged that judgments could not constitutionally be entered for both offenses and asked the court to require the State to elect. The State contends that appellant's objection came too late and that the double jeopardy issue was not preserved for appeal.

A double jeopardy violation may be raised for the first time on appeal if the violation is clearly apparent on the face of the record and when enforcement of the usual rules of procedural default would serve no legitimate state interests. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). Because it is undisputed that appellant's two convictions are based on the same conduct, if there is a double jeopardy violation it is apparent on the face of the record. And because both convictions arise out of the same trial, enforcement of the usual rules of procedural default would serve no legitimate state interest. *Honeycutt v. State*, 82 S.W.3d 545, 547 (Tex. App.—San Antonio 2002, pet. ref'd). The State argues that if appellant had raised the

49

issue earlier, the punishment phase of trial might have been unnecessary, thus saving judicial resources. But this argument has no merit because appellant's objection came before the punishment phase began. We conclude that the alleged double jeopardy violation is properly before us.

The Double Jeopardy Clause does not impose a limitation on the legislative prerogative to prescribe the scope of punishment. *Missouri v. Hunter*, 459 U.S. 359, 368 (1983); *Ex parte Kopecky*, 821 S.W.2d 957, 958-59 (Tex. Crim. App. 1992). A defendant suffers multiple punishments in violation of the Fifth Amendment only when she is convicted of more offenses than the legislature intended. *Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999). When a legislature specifically authorizes multiple punishments under two statutes, even if those two statutes proscribe the "same" conduct, "a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Hunter*, 459 U.S. at 368-69.

Penal code section 22.04, defining the offense of injury to an elderly person, provides:

> A person who is subject to prosecution under both this section and another section of this code may be prosecuted under either or both sections. Section 3.04 [mandatory severance] does not apply to criminal episodes prosecuted under both this section and another section of this code. If a criminal episode is prosecuted under both this section and another section of this code and sentences are assessed for convictions under both sections, the sentences shall run concurrently.

50

Tex. Pen. Code Ann. § 22.04(h) (West Supp. 2005). This statute plainly authorizes multiple punishments when a defendant's conduct violates both section 22.04 and another penal code section. *See Gonzalez*, 8 S.W.3d at 641 n.4. Point of error thirty-six is overruled.

### *Conclusion*

Having overruled all of appellant's points of error, we affirm the judgments of conviction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Onion*

Affirmed

Filed:   March 23, 2006

Publish

\*   Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).